## UNITED STATES v. NORTH BLOOMFIELD GRAVEL MIN. CO.

(Circuit Court, N. D. California. October 5, 1892.)

No. 7,865.

1. **FEDERAL COURTS—JURISDICTION.**
    The question of jurisdiction may be raised upon the final argument of a cause in a federal court, and by statute it is made the duty of such court to dismiss the same, upon its own motion, whenever the want of jurisdiction shall appear.

2. **SAME—INTERSTATE COMMERCE—NAVIGABLE STREAMS—OBSTRUCTIONS.**
    By 24 St. at Large, p. 326, appropriations were made for the improvement of certain rivers in California, with a provision that the balance of such appropriation should not be used until certain hydraulic mining, hurtful to navigation, had ceased on such rivers, and in the event of its continuance authorized the secretary of war to institute legal proceedings to prevent the same. *Held,* that this legislation was a sufficient assumption of national jurisdiction over the waters in question, under the commerce clause of the constitution, to confer upon the federal courts jurisdiction of a suit by the United States to enjoin the continued deposit of mining debris injurious to navigation.

3. **NAVIGABLE WATERS—OBSTRUCTIONS—MINING DEBRIS—INJUNCTION.**
    In an injunction suit by the United States against a company engaged in hydraulic mining, alleged to be obstructive of navigation of the waters in question, it appeared that the operation of defendant's mine had been enjoined some time prior to the commencement of this suit; that intimation was made in the decree that, when it was satisfactorily shown to the court that proper impounding reservoirs had been constructed, such decree would be modified so as to permit resumption of operations; and that the company, before the bringing of the present suit, had caused to be erected extensive works, by means of which it impounded upon its own land, and within its own mine, all materials likely to injure the navigation of the streams. *Held,* that an injunction should be denied.

In Equity. Bill by the United States against the North Bloomfield Gravel Mining Company to enjoin it from continuing its hydraulic mining operations so as to obstruct or endanger the navigation of certain rivers. Injunction denied.

A. L. Rhodes and Alfred Barstow, for complainant.

C. W. Cross, for respondent.

GILBERT, Circuit Judge. This is a suit for an injunction, brought by the United States, as complainant, against the defendant corporation. The essential averments of the bill are that the mining company is engaged in hydraulic mining in Nevada county, and dumping its debris and tailings in such a way that the same flow into the South Yuba river, a tributary of the main Yuba river, thence into the main Yuba river, thence into the Feather river, and thence into the Sacramento; that the Yuba river is navigable from Marysville to its mouth, and the Feather River is navigable from the mouth of the Yuba to the Sacramento, and that the Sacramento is navigable from its mouth to the mouth of the Feather; that heretofore extensive hydraulic mining had been carried on upon the western watershed of the Sierra Nevada mountains, which had done great injury to the navigable streams referred to; and that the hydraulic mining, as conducted by the defendant, had done great injury to said navigable

streams, and the continuation of it will further materially contribute to the injury complained of. The answer of the defendant denies that it was dumping debris or tailings from its mining operations so that the same flowed into the said rivers, but it alleges that it has erected extensive impounding works, by means of which it impounded, upon its own lands, and within its own mines, all material likely to injure the navigation of said streams, and that it would continue to impound such mining material so long as it should continue its mining operations, and that the same would remain permanently impounded and restrained, in such a manner as not to injure the navigation of such streams. A large amount of testimony was taken on behalf of the respective parties, and the case is now to be decided upon final hearing

At the outset we are met with the objection that the court has no jurisdiction of the case, and that there is no right of action in the United States to prosecute the same. This objection was not raised by plea or demurrer or in the answer, but was first presented upon the final argument. It is claimed that this court has no jurisdiction of the cause, for the reason that at the time of the commencement of the suit, in June, 1888, no act had been passed by the congress of the United States by which the United States government had asserted its constitutional right to assume jurisdiction of the navigable streams referred to in the bill. There can be no question of the right of the defendant to raise this objection to the jurisdiction upon final hearing. It is not a question of personal privilege, which can be waived by answer or by going to trial upon the merits. It is a fundamental question, that goes to the right of the court to hear and determine the matters involved in the suit. If the court have not the inherent power to hear and determine the cause, the parties to the suit cannot, either by their failure or neglect to attack the jurisdiction or by their expressed consent and desire to confer jurisdiction, authorize the court to proceed. The judgment of the court in such a case would be a nullity. Hence it is not left to the parties alone to raise the question of the jurisdiction, but by statute it is made the duty of the court itself to dismiss the cause, upon its own motion, whenever the want of jurisdiction shall appear. Grace v. Insurance Co., 109 U. S. 278, 3 Sup. Ct. Rep. 207; Bors v. Preston, 111 U. S. 252, 4 Sup. Ct. Rep. 407; Railway Co. v. Swan, 111 U. S. 379, 4 Sup. Ct. Rep. 510.

In this case, however, if there exists a cause of suit in favor of the United States, this court has undoubtedly jurisdiction of the subject-matter of the same. So that the real question is not so much whether the court has jurisdiction as it is whether the plaintiff has a cause of suit. The subject of the constitutional right of congress to regulate commerce between the states, and the legislation necessary to carry that right into effect, together with the respective jurisdiction of the state legislatures and courts over navigable streams within their borders, have been considered in several decisions of the supreme court, and therein the limits of the jurisdiction of the federal courts have been clearly defined. It is necessary to refer to a few, only, of these cases.

In the case of Gilman v. Philadelphia, 3 Wall. 713, the supreme court affirmed the decree of the court below dismissing a bill brought to prevent the erection of a permanent bridge over the Schuylkill river, at Philadelphia; the supreme court holding that, as the river was wholly within her limits, the state had not exceeded the bounds of her authority, and that until the dormant power of the constitution was awakened, and made effective by appropriate legislation, the reserve power of the state was plenary, and its exercise in good faith not the subject of review by the court.

In the case of Transportation Co. v. City of Chicago, 107 U. S. 678, 2 Sup. Ct. Rep. 185, the supreme court held, in respect of the Chicago river and its tributaries which are navigable, and lie within the limits of the state of Illinois, that congress, in the exercise of its power under the commerce clause of the constitution, may exercise control over the same to the extent necessary to protect, preserve, and improve free navigation, yet until that body acts the state has plenary power over bridges across them.

In the case of Cardwell v. Bridge Co., 5 Sup. Ct. Rep. 423, the question arose whether, by the act admitting California into the Union, and declaring "that all the navigable waters within the said state shall be common highways, and forever free, as well to the inhabitants of said state as to the citizens of the United States, without any tax, impost, or duty therefor," congress had adopted such legislation over the navigable streams as would confer jurisdiction upon the United States courts in a suit between private parties. After mature and careful consideration, the court held that the portion of the statute declaring that the navigable waters should become highways was to be construed together with the remainder of the statute, which declares that the same shall be without tax, impost, or duty, and that the whole intent and purpose of the statute were to provide against the use of navigable streams by private parties to the exclusion of the public, and the exaction of toll for the navigation, and that it did not restrict the power of the state to authorize the construction of bridges, whenever such construction would promote the convenience of the public.

To the same effect is the decision in Hamilton v. Railroad Co., 119 U. S. 280, 7 Sup. Ct. Rep. 206.

In Bridge Co. v. Hatch, 125 U. S. 1, 8 Sup. Ct. Rep. 811, the supreme court, in a decision rendered by Mr. Justice Bradley, affirmed the doctrine of the previous cases, and proceeded further in the line of those decisions, and held as follows:

"There must be a direct statute of the United States in order to bring within the scope of its laws, as administered by the courts of law and equity, obstructions and nuisances in navigable streams within the states. Such obstructions and nuisances are offenses against the laws of the states within which the navigable waters lie, and may be indicted or prohibited as such; but they are not offenses against United States laws which do not exist, and none such exist except what are to be found on the statute book."

The general purport of these decisions is that no recourse can be had to the federal courts on the ground that a federal question is involved unless congress has, in pursuance of the right to regulate

commerce, proceeded to carry out its constitutional power, by legislative enactment, in such a way as to prescribe the limit and extent of the regulation attempted to be asserted. In the cause before the court, however, I hold that it is not necessary that there be an infringement of a law of congress in order that this court may proceed to hear and determine the cause. All that is necessary is that a right of suit shall exist in favor of the complainant. Have the United States the right to preserve and protect the navigability of these streams by this suit for an injunction? It may be true, as contended, that the injury complained of is not an offense against any statute of the United States. It is equally clear that it is not an offense against any unwritten law of the government, for there is no common law of the United States applicable to such a case. The acts complained of, however, are injurious to the navigability of the streams. Congress has the undisputed power to regulate commerce between the states, and consequently it has power to prevent obstructions to navigation in navigable streams. The state of California has not assumed, by the enactment of any statute or by the grant of franchise, to permit these obstructions, or to regulate the same. At the time this suit was commenced the general government could lawfully assume jurisdiction over the rivers referred to. Prior to the commencement of this suit congress appropriated certain moneys for the improvement of these and other rivers in California, and accompanying the appropriation enacted a statute providing as follows:

"The balance of said unexpended money not to be used until the secretary of war be satisfied that hydraulic mining, hurtful to navigation, has ceased on said waters and their tributaries. If he be not so satisfied, he is hereby instructed to institute such legal proceedings as may be necessary to prevent the washing, sluicing, dumping, or discharging detritus, debris, or slickens, caused by or arising from hydraulic mining, into either of said rivers or any of its tributaries," etc., "and he is hereby instructed to use out of said sum as much as may be necessary for said purpose." 24 U. S. St. at Large, p. 326.

This statute, while it does not amount to legislation sufficient to confer jurisdiction upon this court over a suit between private parties, is sufficient to authorize the commencement of this suit by the United States. If this suit were in the nature of a criminal prosecution, or were an action for damages for past injury to navigable streams, there would be good reason to say that no cause of action existed in favor of the United States, for the reason that the wrongful acts in respect of which the action was commenced were not, at the time they were committed, interdicted by any statute of the United States. But this suit is instituted solely to protect navigation by restraining and enjoining future injury. The past injuries are referred to in the bill only for the purpose of informing the court of the nature of the evils complained of, and the extent of the injury to be apprehended in the future. The statute quoted amounts to a declaration that these obstructions to the navigability of streams, which at common law would amount to nuisance, must hereafter cease, and that to prevent their recurrence the secretary of war is authorized to institute any legal proceeding that may be necessary for that purpose. Under the discretion vested in the secretary of war, no remedy could

be so simple, direct, and adequate as this suit for an injunction. But even if there were no express statutory authority for the commencement of this proceeding for an injunction, there is sufficient reason for holding that the United States would have that right, independent of the statute, on the ground that an injunction is a necessary preliminary step to protect the improvements to navigation authorized and about to be made under the act of congress just referred to.

It was said in Bridge Co. v. Hatch, supra, that the appropriation by congress of money to be expended in improving the navigation of a navigable river was no assumption of police power over the river; but in the same decision it is declared that any interference with the operations, constructions, or improvements made by the general government would be an offense against the laws and authority of the United States. In the case of U. S. v. Mississippi, etc., Boom Co., 3 Fed. Rep. 548, it was held that where congress had assumed jurisdiction of a river, in the interest of commerce, by causing the erection of works to improve its navigability, an injunction would be granted by the circuit court, at the suit of the United States, to prevent threatened injury to the improvement. In U. S. v. Duluth, 1 Dill. 469, decided by Mr. Justice Miller, it was held that the United States may bring an injunction bill in the proper circuit court to protect improvements then being made in navigable waters under the authority of congress. If the right thus to protect improvements to navigation already made, and improvements in the course of being made, under appropriations by congress, for that purpose, is accorded to the United States, it is difficult to perceive why a similar right does not exist, preparatory to and in contemplation of such improvements, to restrain acts, the continuance of which would render the objects to be accomplished by the appropriation less effective or of no avail.

It remains to be considered whether, under the allegations of the bill and the evidence introduced on behalf of the respective parties, an injunction should issue as prayed for. The operation of the mine of this defendant corporation was enjoined by a decree of this court in 1884, in the suit of Woodruff v. Mining Co., 18 Fed. Rep. 753, and that injunction still remains in force. In the decree an intimation was made that if, in the future, the defendant corporation should show to the court that it had constructed impounding reservoirs which would successfully impound its mining debris, the decree might be modified so as to permit the operation of the mine. The defendant since that decree, and before the commencement of this suit, had established and was using the system of impounding works referred to in its answer to the bill. The question of fact now to be determined is whether or not, with the use and operation of the impounding works, mining debris escapes from the defendant's mine into the navigable waters of the Yuba, the Feather, or the Sacramento, so as to tend to impair or injure the navigability of those streams. It becomes necessary, therefore, to carefully consider the construction and operation of the impounding device. At the time of the injunction in 1884 the North Bloomfield Mining Company, by the use of its monitors and its system of placer mining, had made an excavation on its grounds, which was in length nearly a mile, in width from 500 to

1,000 feet, in depth varying from 150 to 400 feet. There was no considerable stream of water running through this excavation, and there was no natural outlet to the same. The tailings and debris from the mine had been discharged through a shaft which was sunk through solid rock near the center of the excavation. This shaft was 80 feet in the perpendicular, and connected with a tunnel cut also through the solid rock, a distance of nearly half a mile, and opening into Humboldt canyon, which lies considerably below the level of the excavation. The total cost of the tunnel and shaft were in the neighborhood of half a million dollars. The impounding works were constructed by utilizing the excavation, the shaft, and the tunnel. The impounding area is divided by a dam into two impounding basins, each of about 20 acres in extent, which may be called the old and the new basins. The surface of the old basin lies at an altitude of about 100 feet above that of the new. The mining operations are all carried on at the upper end of the excavation.

The mining is done upon two levels or benches, one at an elevation of about 100 feet above the other. The debris from the upper mining level is carried on that level to the old impounding basin. The debris from the lower mining level is intended to be impounded in the new basin. Near the lower end of the old basin an inclined shaft has been sunk to connect with the tunnel, and its use is to allow the escape of water after all material likely to injure navigation shall have been deposited in the basin. A similar outlet is made in the new impounding basin, and both these outlets are cribbed up, from the bottom, so that a thin sheet of water from the surface, only, can escape. The operation of the old reservoir has been tested, and a considerable amount of debris has been deposited within it. The dam which separates the basins is constructed across the excavation, and prevents the debris from running back from the old basin into the new basin and the lower levels of the mine. The operation of impounding has been conducted in the following manner: The debris from the mining on the upper bench, consisting of gravel, sand, and comminuted clay, together with sufficient water to carry the same, has been conducted by a sluice, with a tolerably swift current, down to the upper edge of the old impounding reservoir, and there discharged into the pond or lake. It has been found that the heavy material is deposited first, the lighter sand and gravel are carried somewhat further, and when the current strikes the body of water in the pond nearly all the remaining material carried by the water is deposited, forming a bench across the upper end of the depositing pool, which presents an almost perpendicular wall from the surface to the bottom. The water, on striking the pool, is diffused through it, and its current apparently ceases. It has the effect to raise the water in the pool, and to cause a constant outpour from its surface over the edges of the lower crib.

There are three objections urged against the operation of this impounding reservoir: First, that it does not successfully remove from the water the material which is carried in suspense, and that the water which escapes by the cribs takes with it material which becomes deposited in the lower streams, and injuriously affects the naviga-

bility of the same; second, that the dam across the excavation is not of durable material, and is liable to break; third, that the cribs are liable to break or decay, and the impounding material may thus escape into the streams below.

Upon the first of these objections the evidence, although voluminous, is not to any considerable extent conflicting. The water that escapes through the cribs is discolored with very fine particles of comminuted clay, which are held in suspense. It is impossible that water that has once fairly come to rest in the pool, and has then been drawn off from the surface through the cribs, should carry with it any sand, or anything other than the lightest material. The evidence goes to prove that the fine clay held in suspense in the water, and which causes its discoloration, is of specific gravity very little greater than water, and that it will remain in suspense so long as the water moves with the velocity of a mile in two hours. The evidence further shows that this material is carried in a state of suspense through the Yuba, the Feather, and the Sacramento rivers, and into the ocean. It does not appear that at any point on those streams the water comes to rest, or the clay which it carries is deposited in an appreciable quantity. After taking into consideration all of the evidence, I am convinced that after the water which conducts the mining debris shall have once come to rest, so as to deposit all the sand and heavier material that is carried in suspense, leaving only the light, flocculent particles of clay which give it its color, no material will be subsequently deposited from it, unless it is brought to rest and so remains for a period longer than it has remained at rest in the impounding pool.

Second, is there danger to be apprehended from insufficiency of the dam which separates the old from the new impounding basin? The dam is constructed of brush and small trees carefully laid, so that the butts form the outer wall. It is made by layers, as the pool fills up, and as the deposited debris requires it. The interstices between the layers of brush are filled in with the gravel, sand, and clay deposited from the flume. The dam, as it now stands, presents a wall nearly 100 feet high, which seems to be a compact, solid mass of gravel, sand, and clay, with the brush interwoven so as to hold it in place. If there were great pressure upon this dam, if it were a dam across a torrential stream, if its breaking or carrying away would discharge into the streams below the debris that has accumulated, it would appear to be clearly insufficient for the purpose intended; but the evidence, together with a personal inspection of the dam, convinces me that there is no great pressure upon the dam. The heavy material deposited has not only accumulated about the dam, but for a considerable distance below, and the mass appears to be now in the process of recementation and solidifying, which already, to a considerable extent, has restored it to the condition of the material in the surrounding hills. If this dam should break it is difficult to see where injury could result, for the impounded material, if it moved at at all, could only escape into the new impounding reservoir. It is plain that there is no danger from winter torrents. The mine is not in the bed of a mountain stream. The amount of water which naturally falls into this excavation is small, and even in a winter

torrent it must either all escape by the cribs, or simply accumulate and form a lake within the walls of the excavation.

It remains to be considered whether there is danger to the navigability of the streams from the breaking, decaying, or destruction of cribs. The cribs are built of logs about a foot in diameter, notched at the corners, and laid in log-cabin style, lined within with heavy planks, tightly nailed, and covered on the outside with planks in a similar manner, so that the opening within, in the clear, is about three or four feet square. It is claimed by the defendant that this material will not decay so long as it is kept moist by the surrounding mass. I do not think that that contention is well established by the evidence. The cribs in time will decay, but they will last for many years, and they will doubtless considerably outlast the use of these pools for impounding reservoirs. After the pools shall have been filled up with mining debris, and these cribs shall no longer be the outlet of the water of the mine, I do not perceive any harm that can come from their decaying. By that time the impounded material must have become, to a large degree, compact and solidified, so that the caving in of any considerable portion of it need not be expected; and, if it should cave in, it is plain to my mind that the result would be simply to choke up the shaft, and permanently close the same. This view is supported by the history of the use of the shaft heretofore. It is proven that the sudden discharge into the shaft and tunnel of a greater amount of debris than the water could carry away has resulted in a choking up of the outlet, and that the mass of material and water above has simply served, by its pressure, to increase the difficulty of removing the material and reopening the shaft. In short, the danger to be apprehended from the operation of the North Bloomfield mine, with its impounding reservoirs, as constructed and used and intended to be used, is so remote and improbable that the court is not justified in enjoining the use of the property, and thereby interdicting a valuable industry.

In arriving at this conclusion I am not unmindful of the great damage to navigation that has heretofore resulted from the deposit of mining debris in these streams, nor of the important interests that are involved, but I am convinced that in the case of this particular mine the contingency has arisen which was contemplated in the decision of this court in the Mining Debris Case, in providing that the decree might thereafter be modified upon a showing to the court that a plan to obviate the injuries had been successfully executed.

The injunction will be denied.