Argued 20 May; decided 29 July, 1901.

### YORK v. DAVIDSON.

[65 Pac. 819.]

WATERS—DAMAGE BY MINING DEBRIS*—INJUNCTION.

Miners who deposit debris in public streams must make some arrangements to prevent the filling of the streams and consequent deposit of the floating refuse on the banks—otherwise the continuance of the mining will be enjoined, at the suit of injured riparian owners.

---

* REPORTER'S NOTE ON THE DEBRIS QUESTION.—The authorities on the question here decided are quite fully collected in footnotes to *Columbus, etc. Iron Co.* v. *Tucker*, 29 Am. St. Rep. 528, 539, 12 L. R. A. 577; *Mississippi Mills Co.* v. *Smith*, 30 Am. St. Rep. 546, 551 (with note, The Debris Question); *Price* v. *Oakfield Creamery Co.*, 24 L. R. A. 333; *Drake* v. *Lady Ensley Coal & R. R. Co.* 24 L. R. A. 64 (with note, Polluting Streams by Mining Debris), 48 Am. St. Rep. 77; *Elder* v. *Lykens Val. Coal Co.* 37 Am. St. Rep. 742 (with note, Liability for Injury Caused by Mining Debris).

39 OR.— 6.

From Josephine : HIERO K. HANNA, Judge.

Bill by Henry York against C. T. Davidson and others to enjoin the operation of defendants' mine. From a decree granting the injunction, defendants appeal.

AFFIRMED.

For appellants there was a brief and an oral argument by *Mr. H. D. Norton.*

For respondent there was a brief and an oral argument by *Mr. Geo. W. Colvig.*

MR. JUSTICE WOLVERTON delivered the opinion.

Defendants are engaged in placer mining by the hydraulic system in Taylor's Gulch, a tributary of a stream which traverses a portion of plaintiff's land, known as "Carris Creek"; the necessary water, aside from that contained in the gulch, being carried to it from Rocky Creek, Miners' Creek, and Carris Creek by means of ditches. The two creeks first named also discharge into Carris Creek, and all these streams, including Miller Creek, flow more or less through a decomposed granite formation. The point of operation is located two miles above the lands of the plaintiff, and at an elevation of about three hundred feet. The defendants have been using a giant for some three. or four years, and, to prevent the tailings and debris from their mine from being carried below, they built two impounding dams in the gulch, and recently constructed a by-wash around the lower dam, by cutting a channel along the side hill above the deposit, so that the water might flow down the gulch without disturbing the deposits. Later, Miller and Savage connected their ditch with the by-wash, by means of which the water from the mine is conveyed across by the

head of Rocky Creek and its tributaries into Miller Creek. This latter stream intersects another portion of the plaintiff's premises, and is utilized for irrigation purposes. The plaintiff alleges that the defendants have been discharging large quantities of gravel, silt, sand, and other debris into Taylor's Gulch, which has been carried into Carris Creek, and has caused the bed of the stream to fill up and to overflow its banks where it traverses the plaintiff's land, and to cast such refuse matter thereon, thus destroying it for the purpose of agriculture, for which it is adapted; and prays that they be enjoined from casting and discharging any sand, silt, or other refuse matter from their mine into Carris Creek or its tributaries, or into Miller Creek, whereby the same may be washed or carried upon his premises, and from impounding the water in any manner so as to interrupt its flow across the same. The plaintiff having obtained a decree in his favor, the defendants appeal.

The defendants seem to concede that the plaintiff has been injured materially by the washing of granite sand upon his premises along the course of Carris Creek, but they seek to account for it through causes other than such as were superinduced by their acts : (1) They say that an unusual freshet which occurred in the early part of 1890 was the principal cause ; (2) that the plaintiff and his agents have so obstructed the stream, by felling trees and constructing dams across it, as to divert the water from its natural course, and thereby to overflow its banks ; and (3) that the deposits may be accounted for almost entirely, if not wholly, through natural erosion by the elements, and the operations of mines along Carris Creek and its tributaries by persons other than the defendants. They further contend that their impounding dams are permanent and durable structures, of sufficient capacity and efficacy to securely impound the tailings, sand, and debris

from their mine, and to discharge the water therefrom down the gulch reasonably pure and free from such deleterious matter. Beyond this, they assert that, after the water is discharged from their mine into Taylor's Gulch, it is taken up by the ditch of Miller and Savage, and carried into Miller Creek. Of these in their order.

Peter Burkhalter and John Gentner began mining early in the '60s on Miners' Creek, a tributary of Carris Creek, which was continued by one or both of them from time to time, covering a period of thirty years. The tailings from their mine were discharged into the stream, and were carried upon the land of the plaintiff to such an extent that in January, 1886, he instituted a suit against them to prevent further operations to his damage. This resulted in an agreement on the part of Burkhalter and Gentner to construct a new channel through the plaintiff's field, and keep it open and in good order, so that the mining debris would be carried past his premises, and to be responsible for any damage that might ensue by reason of their dereliction. Early in 1890 there came a freshet carrying the sand and debris down Carris Creek in such quantities as to fill up the new channel and overflow the plaintiff's lands, covering a considerable tract with the deposit, thereby rendering it unproductive. Of this Mr. York made complaint, and the matter was arbitrated, and Burkhalter and Gentner paid the damages assessed. Shortly thereafter they concluded their mining operations, and sold their ditch to the defendants, and it now constitutes one of their sources of water supply. After the new channel constructed through the plaintiff's field had become obstructed by the freshet of 1890, the plaintiff built a dam across it at its upper junction, with a view to turning the water of the creek back into the old channel, deeming it the better outlet; and this, together with the felling of some trees and filling in with brush

along the margin, for the purpose of confining it within the channel, constitutes, in substance, all that the plaintiff has done in the way of damming up the stream and flooding his own land. What he did, so far as we are able to discover from the evidence, tended to retard, rather than to precipitate, the flow of the water beyond the banks of the stream.

It has been shown quite clearly that since the defendants have been engaged in hydraulic mining on Taylor's Gulch a decomposed granite sand has been deposited by the action of Carris Creek upon plaintiff's land along its course, and in such quantities as to very materially enlarge the area previously covered, resulting in further damage to him. This enlargement is estimated at one and one fifth to five or six acres. Now, we may inquire whether this later deposit came from the defendants' mine, or may be accounted for through the natural erosion of the elements and the mining operations of ·other persons. Specimen exhibits of the sand found upon the land of the plaintiff and that taken from the impounding dams have been offered in evidence, bearing a marked resemblance one to the other. Very little weight can be attached to this circumstance, however, as other specimens have been produced, coming from Miners' Creek, Mahalley Creek, Rocky Creek, all discharging into Carris Creek, resembling these very closely. But there is evidence of the fact of a more convincing character. Mr. Wright testifies that he traced the sand up Carris Creek to Taylor's Gulch, and thence up the gulch to the dam; that above the junction of Taylor's Gulch there was little or no sand discoverable in Carris Creek; and that apparently all of it came down the gulch. Several other witnesses testify also to having traced the deposit to the same source. J. W. York, brother of the plaintiff, whose land adjoins his brother's, and through which Carris

Creek flows, testifies that during the winter previous to the institution of this suit, sand came down from defendants' mine every time they turned off a reservoir head, and that at one time their dam broke, and it came down in such quantities as to fill up the creek along the road by his dwelling for the space of two hundred or three hundred yards, and much of it was washed out upon the plaintiff's land. And W. B. York, a son of the plaintiff, testifies that he has observed the sand as it was being carried down Carris Creek and upon the land of the plaintiff while the defendants' mine was in operation, and at the time the dam broke there was a large increase of the deposit. Miller and Savage are the only persons besides the defendants engaged in hydraulic mining above the plaintiff. Their mine is located upon Miller Creek, and the tailings therefrom have been so disposed of that none of them have as yet been carried down the stream. The only other mining shown to have been done on Carris Creek or its tributaries in the mean while was by H. L. Hansen and Frank Bailey. Hansen was engaged for a time on Carris Creek, removing some old tailings, and just prior to the institution of this suit was mining by the ground-sluicing process in Taylor's Gulch, immediately below the lower impounding dam of the defendants. Debris from his mine on Carris Creek was cast into the stream and carried down, but not from that operated in Taylor's Gulch, as he was working there in rock and gravel. He relates that, at the time defendants' dam broke, the tailings came pouring down in great quantities, and covered up his works. Bailey mined some in Taylor's Gulch in 1897, but not extensively. Aside from this, there may have been a little mining done on Rocky Creek. But these mining operations were not sufficiently extensive to account for the added accumulation of the sand and debris upon the plaintiff's land, nor is the natu-

ral erosion by the elements adequate for the purpose.
There has been considerable mining on Carris Creek and
its tributaries in earlier days, but the debris therefrom
has become so compact and solidified by lapse of time
that the elements have no greater effect upon their disin-
tegration and precipitation down the watercourses than
on the natural formation of the country.

With a view to retaining the tailings, sand, and debris
from their mine, and preventing them from being carried
down the gulch into Carris Creek, the defendants have
constructed two restraining or impounding dams across
the bed of the stream and gulch.  The one first built
(being the lower dam) was constructed by felling a large
tree three or four feet in diameter across the channel.
Smaller logs, from eight to fifteen inches through, were
stood up against this, with the lower ends imbedded in
the bottom of the creek.  Other smaller timbers were
used for carrying it up, some being placed lengthwise,
and others crosswise, of the stream, and brush filled in
along with these, so as to make the structure compact.
The dam was built up as it filled with tailings and debris,
the idea being to keep it somewhat above the tailings,
so that the water would form a pond, and be drawn off
gradually by percolation through the brush, and thus
allow whatever sediment was carried down to settle
therein before the water would be liberated.  The upper
dam was built of small trees cut and thrown in across
and lengthwise of the stream, and filled in with brush
as it was carried up.  In dimensions, the lower dam is
sixteen and one half feet high, and one hundred and sixty
feet across from bank to bank, and the deposit extends up
the stream for the distance of two hundred and seventy
feet or more, containing about thirty thousand tons.
The dimensions of the upper dam are not given, but
both are carrying all the tailings they will hold.  That

these structures have not prevented the sand and other·
sediment from passing down the gulch in quantities suffi-
cient to injure the plaintiff is manifest from what men-
tion has been made of the testimony heretofore.  On
February 28, prior to the institution of this suit, there
was a breach in the lower dam, caused by a slight freshet.
This was of such proportions as to allow the water and
debris to discharge beneath the large tree used in its con-
struction, and large quantities of the deposits were carried
out and down the gulch.  It is estimated that from one
twentieth to one fourth of them were thus carried away.
This breach induced the construction of a by-wash in the
hillside around the dam for the purpose of carrying the
water by without contact with the deposits.  A little later
Miller and Savage connected their ditch with the by-wash,
which ordinarily draws off all the water entering it.

There is a controversy as to whether Taylor's Gulch
may be deemed a torrential stream.  That it is a natural
watercourse, there can be no doubt.  It is from two and
one half to three miles in length, has a regular channel,
is fed by a watershed formed by the hills on either side,
and carries water during the rainy seasons.  As described
by one of the witnesses, sometimes during the rainy sea-
sons there is very little water in it, while at others, when
the snow is melting or there is a freshet, it carries from
one thousand five hundred to two thousand inches.  An-
other witness testifies that he saw it in 1890 above the
defendant's mine, and there was a large amount of water
in it,—so much that it would have been dangerous to
cross it with a horse.  About this there is a contrariety of
opinion.  Other witnesses say that during heavy freshets
it does not carry more than an ordinary pipe head, such
as was being used at the mine.  But, from what we may
legitimately infer, the stream is probably of such char-
acter that when conditions are favorable water is precipi-

tated through its course in considerable volume and with much force. Whether it falls within the category of torrential stream is not necessary for us to determine. Enough has been shown to convince us that the system employed by the defendants for impounding the tailings and debris from their mine within the gulch is not effective for the purpose, and that the dams are so constructed that they are unsafe and insecure, especially in times of freshets, and are liable to give way and precipitate their contents upon the land of the plaintiff, and for this reason their use should be discontinued. The testimony is conflicting touching the capacity of Miller's and Savage's ditch to carry all the water from the mine. Ordinarily it will, but in times of freshets it is probably insufficient for the purpose. But, be this as it may, there is evidence that a large amount of sediment from the mine is carried into it, and, if allowed to continue, will be borne upon the lands of the plaintiff, through Miller Creek, and will serve to increase his injuries.

The decree of the court below restrains the defendants from in any manner casting or discharging any waste or refuse matter from their mining operations into Carris or Miller Creek, or impounding the same at any point above the plaintiff's premises. This decree should be affirmed, except that defendants should be allowed to impound their tailings and debris in Taylor's Gulch, or elsewhere, as convenience may suggest, when they shall have adopted and constructed an efficient and durable system or device for the purpose, such as will meet with the approval of persons skilled in such matters and the court. In support of these conclusions, see *United States* v. *North Bloomfield Gravel Min. Co.* (C. C.) 53 Fed. 625, and *United States* v. *Lawrence*, 53 Fed. 632. Let the decree be entered accordingly.     MODIFIED.