Decided 24 July, 1906.

## BROWN v. GOLD COIN MINING CO.

86 Pac. 361.

WATERS—EVIDENCE AS TO CAUSE OF POLLUTION.

1. The evidence justifies the finding of the trial court that the injury to plaintiff's land complained of was caused by his having closed the gate in his dam or by permitting it to remain closed at a time when he did not need the water of Rith Creek for irrigation.

WATERS—INJUNCTION AGAINST POLLUTION BY MINING DEBRIS.

2. Where, by reason of the insufficiency of defendant's dam, the dumping of tailings from defendant's quartzmill into the stream by which plaintiff's farm was irrigated during the irrigation season will practically destroy the farm, plaintiff is entitled to enjoin defendant either from operating its mill during the irrigation season or from permitting the tailings during that period to flow down the channel of the stream.

WATERS—EQUITABLE ESTOPPEL BY TACIT ACQUIESCENCE.

3. That plaintiff was employed by defendant about its quartzmill, and knew it was being constructed to reduce ores, and made no immediate objection to defendant's plan for the dumping of tailings into a stream by which plaintiff's farm was irrigated, is not sufficient to constitute an equitable estoppel, precluding plaintiff from thereafter maintaining a suit to restrain such deposit, as the relation of master and servant does not

constitute such a joint participation in a joint enterprise as to support an estoppel.

RIGHT OF RIPARIAN PROPRIETOR TO FLOW OF STREAM.

4. A riparian proprietor on a stream is entitled to have it flow in its accustomed location unimpaired in quality and undiminished in quantity, except by the reasonable use of other like proprietors.

For example: A prior settler and riparian owner on a stream is not obliged to give up the use of such stream for domestic and stock purposes in favor of a subsequent mining plant further up the stream, because he can procure water elsewhere on his premises, but he is entitled to restrain the pollution of the stream as it flows.

APPEAL—DISCRETION AS TO COSTS IN EQUITY.

5. The supreme court may adjust the costs and disbursements in an equity case as it may deem proper, under Section 566, B. & C. Comp, as, by assessing the charges of both trial and appeal against the losing party.

From Baker: SAMUEL WHITE, Judge.

Statement by MR. JUSTICE MOORE.

This is a suit by A. P. Brown against the Gold Coin Mining Company, a private corporation, to enjoin the pollution of the water of a stream and from interfering with the flow thereof. The plaintiff is the owner of the S. $\frac{1}{2}$ of the N. W. $\frac{1}{4}$ and the E. $\frac{1}{2}$ of the S. W. $\frac{1}{4}$ of section 22 in township 12 S., of range 43 E. of the Willamette Meridian, which is arid land. Rith Creek, a nonnavigable stream, flows easterly and forms, in the south 40 acres of such land, a confluence with Shirt Tail Creek, which latter stream flows northeasterly and empties into Burnt River. These creeks have a fall of about one foot to the rod, their banks are from three to four feet deep, and each stream affords about the same quantity of water which generally ceases to flow in August of each year. The plaintiff's predecessor in interest settled on this land and, about 1886, constructed a ditch on the north side of Rith Creek and another on the opposite side whereby he made a prior appropriation of all the water thereof during the irrigating season, which quantity has ever since been used in raising crops on the land described. On the east side of Shirt Tail Creek, below the mouth of Rith Creek are located the plaintiff's house and barn in the order named. The defendant owns several mining claims on Rith Creek and in 1905 built above plaintiff's premises a quartz mill which it completed November 5th of that year and operated for 18 days in pulverizing ore, during which time tailings were carried down

the channel of the creek to plaintiff's land, filling his north ditch and depositing a sediment on about four acres of his alfalfa meadow.   The complaint states the facts hereinbefore detailed and alleges that the defendant unlawfully diverted and polluted the water of Rith Creek, rendering it unfit for household and domestic uses, compelling plaintiff to carry water a great distance for such purposes and to drive his cattle elsewhere to quench their thirst, and that defendant's agents threaten to continue such trespass and nuisance and, unless restrained, will do so to plaintiff's irreparable injury.

The answer denies the material allegations of the complaint and avers that the mill was constructed with plaintiff's knowledge and consent, in relying upon which a large sum of money was expended whereby he ought now to be estopped to claim the right asserted; that defendant erected and maintained a safe dam which prevented tailings from its mill from flowing to plaintiff's premises; that there are two or more springs on his land furnishing sufficient water for domestic and stock purposes and that he has never used the water of Rith Creek therefor; that the quartz mill was not started until the irrigating season had closed and the channel of the stream was opened, but plaintiff for the purpose of commencing this suit, purposely closed the headgate of his dam, thereby flooding his land and causing the sediment to deposit thereon.   The reply put in issue the allegations of new matter in the answer, and, the cause being tried, the suit was dismissed, and plaintiff appeals.

REVERSED.

For appellant there was a brief over the name of *Hart &
Smith,* with an oral argument by *Mr. Julius Newton Hart.*

For respondent there was a brief over the name of *John Langdon Rand,* with oral arguments by *Mr. Rand* and *Mr. James
Henry Raley.*

MR. JUSTICE MOORE delivered the opinion of the court.

1. The testimony given at the trial shows that the defendant in excavating three terraces on a side hill for the foundations of its mill, placed the rocks and earth so removed in the bed

of Rith Creek, intending to form a dam to retain the tailings. H. J. Stillman, who constructed the dam, testifying as to its dimensions, says it was about 50 feet long, extending across the creek, 30 feet wide, and 8 or 10 feet high and backed the water about 100 feet. The boughs of some trees were used in making the dam, and referring thereto the witness, C. M. Foster, a civil engineer, was asked this question:

"How much brush or other obstructions did you find in the channel of Rith Creek at or near the defendant's quartz mill?"

He replied:

"Well, there were one or two armfuls. I think a man could take the brush up in his arms. The brush was lying across the creek and the water running under. I would not say whether it had been placed there purposely or not."

T. H. White, the president of the defendant corporation, as its witness, testified that the brush used in the dam could not be seen except at the top of the embankment, and describing the obstruction to the flow of water and the material of which it was composed, he said:

"The main dam consists of large bowlders taken from the excavation and brush that was torn down and taken away from the excavation and thrown into the bed of the creek, together with the dumping of the material taken from the excavation; so the body of the dam, the slum dam, consists of brush and cottonwood trees taken near by, cut down and placed across the stream to prevent tailings from going down the creek.

Q. About how many armfuls or cords of such brush or trees was used in the construction of the slum dam?

A. It would only be an estimate. The exact amount I do not know for the man who did it, done it when I was not there. I wasn't there all of the time.

Q. Did you see it after it was done and before the mill was run?

A. I did.

Q. What would be your estimate of the number of cords used in the construction of this?

A. Perhaps one half a cord of brush of cotton wood trees.

Q. And with that placed where, with reference to the main dam?

A. At the upper end of the main dam, and directly across the stream."

C. B. Johnson, as defendant's witness, stated that the dam referred to was constructed of timbers 12 by 12 inches square, of various lengths, logs and planks, but as his testimony in respect to such lumber is uncorroborated by that of any other witness, we think the declarations under oath of Stillman and of White as to the material of which the dam was made, are entitled to more respect. The testimony of Johnson must therefore be disregarded, for he evidently had some other dam in mind.

The testimony further shows that when this cause was tried in December, 1905, the water of Rith Creek had cut out one end of the dam at the mill so that no pond remained, thus demonstrating the faulty construction of the dam, which defect is clearly evidenced by the testimony of White and justifies the court's finding that the dam was not sufficient properly to impound the tailings from the mill, a part of which escaped and was carried down the creek to the head of plaintiff's ditch. It will be remembered that the defendant began operating its mill November 5, 1905. At that time the ground in the vicinity of Rith Creek was frozen. Several witnesses who have had experience in irrigating arid lands in that part of the State, testified that the artificial application of water at such a time to an alfalfa meadow is detrimental to the crop. The plaintiff maintains in Rith Creek a dam having a head gate which when closed raises the water and forces it into his lower or north ditch. When this gate is open and the volume of water is sufficient, the deep banks of the creek and its fall give the current such a velocity that it carries all tailings placed in the stream into Shirt Tail Creek and thence into Burnt River. The plaintiff, as a witness in his own behalf, testified that this head gate had not been opened since May, 1905, and was not raised while the defendant operated its mill, during which time his north ditch, for about 300 yards from its head, was filled with tailings, and sediment was deposited on about four acres of his alfalfa meadow. His testimony in respect to the condition of the head gate is questioned by the declaration of several witnesses who say that a slimy deposit was seen on the banks of

the creek immediately below his dam, which stain would not have been in evidence if the gate had been closed all the time, and also by showing that mud had been banked up against the head gate to prevent any leaks therein, thus showing an effort on the part of some one to magnify the injury which forms the basis of equitable intervention in this suit. Whether or not the head gate was open when the mill was started and was shut while the defendant was pulverizing ore or remained closed all the time the machinery was operated, we do not think it important to consider, for the plaintiff, having no use for the water to irrigate his alfalfa when the ground was frozen, should have raised the gate, if it was closed as he maintains. T. D. Moffat, as defendant's witness, testified that while the mill was in operation he, with E. D. Murphy, met the plaintiff, who, referring to the defendant's agents, said "I am irrigating now for their benefit," which declaration is corroborated by the testimony of Murphy. The plaintiff denies the statement thus imputed to him, but his testimony must be taken with some misgivings for 11 witnesses say that his reputation for truth and veracity is bad. Other witnesses called by the plaintiff say that his reputation in this respect is either good or that they never heard it questioned. We think the testimony justifies the court's finding that the injury complained of by the plaintiff on account of the tailings deposited in his ditches and on his meadow was caused by his closing the head gate of the dam or by permitting it to remain closed at a time when he did not need the water for irrigation.

2. The court based its decree dismissing the suit on the ground that the plaintiff contributed to the injury of which he complains by shutting down the head gate of his dam or by permitting it to remain closed when he had no occasion to use the water of Rith Creek. It should be assumed that the operation of the defendant's mill will be continued until the valuable quartz in its mines has been removed and the ore extracted therefrom, and that such work will probably be pursued until it ceases to be profitable. This being so, the dumping of tailings in the creek, during the irrigating season, with no more pro-

tection against injury therefrom than the defendant's dam affords, will practically destroy plaintiff's farm, so that, based on the fact ·found by the court as to the insufficiency of that dam properly to retain tailings, the conclusion of law deducible therefrom should have been a decree enjoining the defendant from operating its mill in the irrigating season, or from permitting the tailings, during that period of the year, to flow down the channel of the creek, thus compelling the defendant to ·erect and maintain a sufficient dam: *Carson* v. *Hayes,* 39 Or. 97 (65 Pac. 814) ; *York* v. *Davidson,* 39 Or. 81 (65 Pac. 819).

3. The cause being tried in this court anew, such a decree should now be rendered, unless the plaintiff by his conduct, is estopped to assert his prior right of appropriation of the waters of Rith Creek. T. H. White testified that in March, 1905, while he and his associates were developing the mining claims on Rith Creek with a view of buying them, he met the plaintiff, who expressed the wish that the value of the property might justify the building of a quartz mill thereon. As a basis for the equitable estoppel relied upon we quote from White's testimony as follows:

"During my conversation with Mr. Brown I asked him, in the event our company should erect a mill above his place, if he would object to the muddy water or tailings or debris that might come from such place. Mr. Brown replied that he would not; that it would be beneficial to him for the reason that his ground lying on a hillside, and quite a grade under his ditches, it being of a loose decomposed formation, the water as it was used, or as he had used it, cut away and made trenches which exposed the roots of his alfalfa, and that if there was a mill above his place that the sediment, slimes and tailings would be beneficial to his land; would also be beneficial to his ditches, they would aid the water in flowing through the ditches, bottling the bottoms of them, making them tighter so that they would carry water further, and that the muddy water, sediment and slime deposited upon his lands would seal the pores of the land and hold the loam or surface from being cut by the action of the water, and would thereby be beneficial."

White also testified, in effect, that he explained to his associates the plaintiff's representations in respect to the waiver of his rights and that, relying thereon, the defendant corporation

paid $15,000 for the mining claims and expended the further sum of $17,000 in erecting the mill. The plaintiff denies that he made such representations, but, as his reputation for truth is challenged as hereinbefore indicated, it must be assumed that the evidence on this branch of the case preponderates in favor of the defendant.

The evidence shows that the plaintiff was employed by the defendant about its mill; that he knew it was being constructed to reduce ores and made no objection to the erection thereof. Such tacit acquiescence, however, is not sufficient to create an equitable estoppel: *Lavery* v. *Arnold,* 36 Or. 84 (57 Pac. 906, 58 Pac. 524) ; *Hallock* v. *Suitor,* 37 Or. 9 (60 Pac. 384) ; *Ewing* v. *Rhea,* 37 Or. 583 (62 Pac. 790, 52 L. R. A. 140, 82 Am. St. Rep. 783) ; *Bolter* v. *Garrett,* 44 Or. 304 (75 Pac. 142). To produce such an impediment, the evidence must conclusively show that money has been expended or labor performed in makpursuant to an agreement of the parties, in relation to the exercise of some right over or easement in the lands of another, or some joint participation of the parties in the enterprise from which a license to do the particular act relied upon may reasonably be inferred: *Garrett* v. *Bishop,* 27 Or. 349 (41 Pac. 10) ; *North Powder M. Co.* v. *Coughanour,* 34 Or. 9 (54 Pac. 223) ; *McPhee* v. *Kelsey,* 44 Or. 193 (74 Pac. 401, 75 Pac. 713.) The relation of master and servant does not constitute the joint participation in a common enterprise that is necessary to raise an estoppel by conduct, to create which the party against whom the legal bar is asserted must have taken an active part in the adventure, in consideration of the anticipated benefits which he expected would accrue to him from the completion of the undertaking. The plaintiff's employment by the defendant was, therefore, insufficient to bind him in any manner by his silence. The advantages that the plaintiff contemplated would be derived by the puddling of his ditches with sediment, so as to make them safe conduits of water, furnished an adequate consideration for the parol license which, by express agreement, he granted. Such privilege must have been founded on the hypothesis that the tailings from defendant's mill would

be retained in a safe impounding dam until the greater part of
the slums had been precipitated, when the water, though some-
what muddy, could be liberated and would flow to the
head of plaintiff's ditches and thence upon his lands,
and there used without injury in irrigating his crops. The
testimony shows that this method of operating a slum dam can
be pursued without serious detriment to persons who use the
water of a stream for irrigation below the artificial pond where
tailings are held. The dirt, rocks and brush which the defend-
ant dumped into the bed of the creek did not constitute such a
dam as the plaintiff might reasonably have expected would be
constructed.

4. The testimony of plaintiff's witnesses is to the effect that
the water which he has heretofore required for household pur-
poses and for his stock has been obtained from Shirt Tail Creek
below the mouth of Rith Creek, and that the tailings from the
defendant's mill so polluted the former stream as to render the
water thereof impure and to compel him to secure it for the
purposes indicated at other places, thereby damaging him. The
plaintiff was asked this question:

"Prior to defendant's operations, where and how did you get
the water that you used for household purposes?"

He replied:

"Got it out of the creek below the house about 40 feet; took
it out of the creek; dipped it up out of the creek."

This witness further testified that there were times when he
obtained water from other sources but when winter approached
he was obliged to secure it from Shirt Tail Creek for household
purposes and for his stock; that after the defendant began
operating its mill, he dug a hole in the bank of the creek, about
150 feet from his house, and got seepage water from the muddy
current of the stream that was not fit to drink; and that he was
compelled to drive his stock 150 yards to water when prior
thereto they had secured it in the barnyard without attention.

As an inference tending to disprove the plaintiff's declaration
upon oath that he procured water for domestic purposes from
Shirt Tail Creek, the evidence discloses that he had a hog pen

in the bed of Rith Creek just above its confluence with that
stream.  He admits on rebuttal that he had such a sty at the
place indicated, but testifies that it had not been used for the
purpose for which it was made since the previous winter, his
hogs having been kept out of the inclosure so that he might use
the water.  The court alluded to such pen and found that on
plaintiff's premises water could be secured from other sources
which was not contaminated by the defendant's mill and which
he could use for household and stock purposes.  The testimony
of plaintiff's witnesses is to the effect that in 1905 the creeks
dried up in July, which was uncommon; that a spring rises in
the bed of Rith Creek near its mouth that affords some water
in the dry season; that the creeks rose before water could be
secured from other sources and that from the operation of the
defendant's mill the water in the creeks became so muddy that
plaintiff's stock would not drink it.

The plaintiff, being a riparian proprietor on Rith Creek, was
entitled to have that stream flow through his premises undimin-
ished in quantity, except as to the reasonable use thereof by
other like proprietors, and unimpaired in quality,. and because
he might possibly secure water for his family and for his stock
at other places on his land than the streams mentioned, does not
impose on him the duty of resorting thereto to supply his needs,
in order that a quartz mill may be operated.  Mining is a legiti-
mate industry, and as the securing of precious metals conduces
to the general wealth of the country, every reasonable rule of
law should be invoked and applied to foster the enterprise.
Farming in the arid region is as much entitled to protection as
any other business.  These and other like employments requir-
ing the use of water from nonnavigable streams should be sim-
ultaneously conducted if possible.  Where, however, a priority
exists in the use of water, the party who makes a subsequent
appropriation for any purpose inconsistent therewith must
yield to the party possessing the superior right.  The evidence
shows that the material pulverized by the defendant's mill con-
sists of quartz and decomposed granite, the reduction of which
by stamps produces a fine clean sand that would not seriously

deteriorate the quality of the water of the stream into which it was deposited.  A text-writer, commenting upon the character of such substance, says: "The tailings from an ordinary quartz mill, when discharged into the running streams, have no greater tendency to deteriorate the quality of the water than the material washed from the natural banks.  As a physical impediment they are comparatively harmless.  They are fine particles of sand artificially produced, but of the same character as that washed into the streams from the rocks eroded by processes of nature which are universal": 2 Lindley, Mines (2 ed.), p. 1527.

Believing that the quartz and granite can be pulverized and the tailings impounded by the construction and maintenance of a proper dam, the decree of the lower court will be reversed, and one entered here perpetually restraining the defendant, its agents and servants, from the further operation of its mill until it has made suitable provision to prevent injury to plaintiff's irrigating ditches, and to the water used by him from the creeks for household and for stock purposes.

5. The plaintiff may recover his costs and disbursements in this court and in the court below.          REVERSED.

---

Decided 24 July, 1906.