## PROVOLT v. BAILEY.*

[121 Pac. 961.]

WATERS—POLLUTION—TAILINGS FROM MINE—CONTRACTS.

1. Where decedent, a mineowner, requested complainants to abandon the line of their first survey of an irrigation ditch, and to construct a flume over decedent's by-wash from the mine, extending the line of survey along a gravel bar on higher ground, so that decedent's mining water and debris would not interfere with the ditch, to which complainants agreed, and in consideration thereof decedent granted a right of way for the ditch according to a new survey, and complainants built a flume across a slough, and extended the survey near the northerly side of the slough to a point where the river from which water was obtained then flowed, and maintained the same until, by the shifting of the river, the flume and head of the ditch were washed away, together with a small bar at the head of the slough connecting it with the south channel of the river, complainants were bound to comply with the conditions of the arrangement to prevent the mining water from running into the irrigation ditch before obtaining relief in a court of equity as to such water.

---

*As to pollution of stream by mining operations, see notes in 22 L. R. A. (N. S.) 276, 38 L. R. A. (N. S.) 272. REPORTER.

WATERS—POLLUTION—MINING WATER.

2. Though a person located on a mining stream and operating a placer mine is entitled to a reasonable and proper use of the channel and the water, he has no right to dump his mining debris into the channel or stream and allow it to be carried down by the water to the land of a lower riparian proprietor, or to fill up the channel to the injury of such riparian proprietor.

From Jackson: FRANK M. CALKINS, Judge.

Statement by MR. JUSTICE BEAN.

This is a suit by E. N. Provolt, Herman Messinger, A. T. Bailey, Lucy Stone, R. F. Lewman, W. M. Sonson, C. M. Rexford, Bridge Point Ditch Company, a corporation, against Lola Bailey, Mary Stevens, D. Layton, Ed. Layton, Lester Layton, Ella Smith, Florence Wilbur, Lena Marvin, Jessie Layton, Amy Layton, Theresa Layton, George W. Colvig, administrator of the estate of J. T. Layton, deceased, to restrain defendants from depositing mining debris in the Applegate River. From a decree in favor of plaintiffs, defendants appeal. The Applegate River is a natural, unnavigable stream flowing in a northwesterly direction past the place of controversy in Jackson County. The defendants are the owners of certain placer mines, which are operated by the hydraulic process, extending up Farris gulch about two miles southwesterly from the river. These mines have been operated for about 30 years by J. T. Layton and his predecessors and successors in interest. The early operations of the mine were carried on at the lower end of Farris gulch, and the mining debris was dumped on the lowland near the river. From year to year the mining operations were extended further up the gulch. At the present time the mining flume extends down the gulch to within about 500 feet of the river. From the end of the flume a race-way runs to the river with a fall in grade of nearly 24 feet, which carries away a large portion of the mining water and some of the tailings and debris. Formerly wing flumes were extended to

the right and left in order to distribute the debris in different places over the dumping grounds. The plaintiff, the Bridge Point Ditch Company, a corporation, is the owner of an irrigation ditch taking water from the river near the defendants' flume, and the other plaintiffs are the owners of land situated on the stream below the defendants' mine, of which from 300 to 500 acres are irrigated. About one-half mile above this point, the river emerges from a narrow gorge with rock walls on either side, and in the vicinity of the outlet of the mine, it is subject to frequent changes. In 1883, for some distance above and opposite the mouth of the flume, the channel of the river was about 500 feet northwest of its present course, and below defendants' flume, it curved to the left across what is now the channel. Afterwards the river changed its course and flowed a little to the southwest of where it now has its course.

Prior to 1906, it flowed past the flume where there is now a gravel bar. In the winter of 1906, this gravel bar seems to have increased, and together with other natural causes, to have divided the river into two channels at a point 200 or 300 feet above the mouth of defendants' flume. The larger north channel took nearly a straight course between the places where the river formerly flowed, while the other channel ran next to the defendants' dumping ground near the head of the irrigation ditch.                         MODIFIED.

For appellants there was a brief and an oral argument by Mr. H. D. Norton.

For respondents there was a brief over the names of Mr. Robert G. Smith and Mr. H. K. Hanna, Jr., with an oral argument by Mr. Smith.

MR. JUSTICE BEAN delivered the opinion of the Court.

The complaint of plaintiffs is practically based upon

two grounds:   (1) The discharge of rock, gravel, earth, sand and slickings or mining debris into the Applegate River above the plaintiffs' lands, thus endangering such lands by causing the river to change its channel and inundate and wash away the same; (2) the discharge of silt, sand, slickings and gravel into the irrigation ditch, washing the same down upon the irrigated fields.

In 1898, when the plaintiffs first made the survey for their irrigation ditch, it appears that there was a depression, called a slough or "by-wash," on the lower part of the ground upon which defendants deposited the mining debris and over which the mining water ran, and in the vicinity of where the plaintiffs established their headgate, extending from that point northerly to the place where the river then ran.   In this by-wash much of the mining water coming from the flume found its way to the river.   The first line of survey for the irrigation ditch was run up this slough or by-wash and across a portion of the dumping grounds used by the defendants.   J. T. Layton, now deceased, was then the owner of the mine, and also the owner of land some distance below, over which the plaintiffs desired a right of way for the ditch.   In the negotiations pertaining thereto, Layton objected to the line of the ditch extending in the by-wash.   At this point he requested the plaintiffs to abandon the line of the first survey and to construct a flume over this by-wash to the north side thereof, extending the line of survey along the gravel bar on higher ground, so that his mining water and debris would not interfere with the ditch.   To all of this the plaintiffs agreed.   On January 27, 1899, a deed was executed by Mr. Layton and wife granting the right of way desired by plaintiffs, in which the consideration was expressed as follows:

"The sum of one dollar to them paid and the relinquishment of a certain survey of the south side of the old

channel of Applegate Creek on the N. ½ of S. ½ of the N.W. ¼ of S.E. Sec. 17, T. 38 S. R. 4 W. by taking a survey made this day, * *"

The plaintiffs thereupon accepted the deed and changed the line of survey for the ditch. They built a flume across the slough and extended the survey near the northerly side thereof to where the river then flowed. In 1899, the ditch was constructed on the second survey where it remained for about three years, when the river, in its shifting, washed away the flume and head of the ditch, and at the same time washed away a small bar at the head of the old slough connecting the latter with the south channel of the river. The ditch company never rebuilt the flume across the slough or channel, and they located their headgate farther to the southwest, about 150 feet from the south bank of the north channel of the river. They ran the ditch from the south channel of the river down the old by-wash for a short distance to where they constructed a dam, turning the water into the regular ditch. Mr. Layton died in 1905. Up to that time, the mining water mixed with the entire water of the river, did no appreciable harm and there were no tailings or mining debris deposited in the stream sufficient to injure the plaintiffs or interfere with the irrigation ditch.

In mining, the defendants worked out the Farris gulch to about the width of from 100 to 125 yards, and they claim that for several years they deposited the heavier part of the mining debris up the gulch on the ground that had been worked. For two or three seasons prior to the commencement of this suit, the amount of tailings and debris reaching the river seems to have increased. During the season of 1907, there was a deposit of debris, a few feet deep, in the south channel of the river, which was carried away the next winter by the high water. In 1908, there was deposited in this channel near the end of the flume, tailings and debris forming a bar about

150 yards long and extending across the channel from three to seven feet deep.  This obstructed the flow of the water in the south channel and the plaintiffs excavated a ditch through the pile of debris.  In order to turn a sufficient amount of water for irrigation into the south channel of the river, they constructed a dam in the north channel at the upper end of the bar where the water courses diverge.  The amount of water in the north channel appears to have been increasing up to that time, the bed of the same being about seven inches lower than that of the south channel, and there being a small bar across and near the head of the latter.  During the dry season there is but little water in the south channel except what is turned in by the dam constructed at the head thereof.  The conditions indicate that if the river is left to take its own course, all the water will flow into what is now called the north channel. After the irrigation ditch followed in the old slough, the muddy mining water, sediment, slickings and some tailings were carried into the ditch and upon plaintiffs' lands, causing a part of the injury complained of.  In 1908, the parties made an effort to adjust matters by extending the flume over the south channel and over the plaintiffs' new ditch, in order to carry the mining water and debris across and deposit it on the bar.  As a result, some of the tailings were deposited in the north channel of the river.  In June of that year, this suit was commenced, since which time it is asserted that the mine has not been worked on account of the injunction.

1. The agreement made between the plaintiffs and J. T. Layton, now deceased, is testified to by the witnesses of the former, and is also indicated by the language incorporated in the deed of the right of way from Layton and wife to the Bridge Point Ditch Company.  The conditions of the arrangement to prevent the mining water from running into the irrigation ditch should be complied

with on the part of plaintiffs before obtaining relief in a court of equity as to such mining water: *McGee* v. *Stone,* 9 Cal. 600; *Coffman* v. *Robbins,* 8 Or. 278; *Edwards* v. *Allouez Mining Co.,* 38 Mich 46 (31 Am. Rep. 303).

In other words, the defendants should be allowed to deposit the debris from their mine upon the land adjacent to the river, substantially as their predecessor, J. T. Layton, did for some time prior to and after the construction of the irrigation ditch by plaintiffs.

2. As bearing upon both points of the controversy, the law appears to be that a person located on a mining stream and operating a placer mine is entitled to a reasonable and proper use of the channel and the water. To unreasonably restrict such use is to interdict the prosecution of a lawful and valuable enterprise: Lindley, Mines (2 ed.), § 841; *Atchison* v. *Peterson,* 20 Wall. 507 (22 L. Ed. 414). However, such miner has no legal right to dump his mining debris into the channel or stream and allow it to be carried down by the water to the land of a lower proprietor, or to fill up the channel to the injury of such riparian proprietor: *Carson* v. *Hayes,* 39 Or. 97, 104 (65 Pac. 814); *York* v. *Davidson,* 39 Or. 81 (65 Pac. 819); *Brown* v. *Gold Coin Mining Co.,* 48 Or. 277 (86 Pac. 361).

The evidence shows that for about two years prior to the commencement of this suit, large quantities of rock, gravel or tailings from the defendants' mine have been deposited in the Applegate River above the lands belonging to several of the plaintiffs, and near the ditch of the Bridge Point Ditch Company. It is practically uncontradicted that the result of such a discharge, if continued, will be to fill the channel of the stream and cause the same to change its course, and inundate and wash away plaintiffs' lands. In order to avoid this threatened injury, the defendants should be enjoined from

continuing to so discharge such debris. It is clearly shown that the plaintiffs can easily construct a ditch from the main channel of the river, 100 feet across the low gravel bar, and thereby conform in substance to the agreement made with J. T. Layton, deceased, and obviate the inconvenience caused by the mining water carrying in suspension fine sand and silt into the irrigation ditch. The defendants, with proper care, such as the construction of dams, can and should prevent the depositing of gravel and rock or tailings from their mines, other than sand and silt carried in suspension, in the river or in the irrigation ditch of the Bridge Point Ditch Company. Thus can the old maxim of "live and let live" be applied.

The decree of the circuit court restrained the defendants from discharging into the river, any sand or silt carried in suspension, during the months of April to September, inclusive. To this extent, the decree should be modified, so as to eliminate from the inhibition "sand and silt carried in suspension," and should otherwise be affirmed as herein indicated. The plaintiffs should recover costs in the lower court, and each party pay their own costs in this court, and it is so ordered.

MODIFIED.

---

On Motion to Dismiss, decided June 6, 1911.

On the Merits, argued Feb. 8, decided March 5; rehearing denied June 4, 1912.