INTERNATIONAL & GREAT NORTHERN RAILROAD COMPANY
v. P. C. REAGAN.

No. 5987.   Decided April 6, 1932.
(49 S. W., 2d Series, 414.)

234

*J. L. Goodman,* of Franklin, *Andrews, Streetman, Logue & Mobley,* and *James E. Kilday,* all of Houston, for plaintiff in error.

The State Constitution, art. 1, sec. 16, prohibits the making of any retroactive law. The plaintiff, in this case, plead and relied upon the provisions of articles 6328 and 7589a of the Revised Statutes of 1925, which said articles were enacted by the Legislature in 1876, and 1927, and the defendant's road, having been constructed in 1872, prior to the enactment of said statutes, the same cannot apply to the defendant (plaintiff in error) in this case, or make it liable, under the facts here presented, in the manner reflected by the trial court's judgment. Galveston, H. & S. A. Ry. Co. v. Wurzbach, 189 S. W., 1006; Gaertner v. Stolle, 238 S. W., 252; North Texas Compress Co. v. Howard, 267 S. W., 1026.

*J. Felton Lane,* of Hearne, for defendant in error.

Defendant in error having plead and proved negligence of plaintiff in error in obstructing the waters of Mineral creek and the consequent backing up of said waters over the defendant in error's farm, and that as a proximate result thereof defendant in error's crops were destroyed and the court having so found as a fact from the proof before him, the question of

whether articles 6328 and 7589a were applicable or not would be immaterial.

Article 6328 imposed the duty of maintenance of such right-of-way in such manner as not to back water up on to defendant in error's farm; and plaintiff in error having failed to perform such duty of maintenance is liable for the injuries resulting, irrespective of when the original roadbed was built.

As plaintiff in error was liable for said destruction of defendant in error's crops, both because of its common law negligence and because of its failure to perform its duty of maintenance of said right-of-way so as not to destroy said crops as imposed by the prospective operation of article 6328, it would be immaterial whether article 7589a applied or not. Article 1859 Revised Statutes, 1925; Rule No. 62a for Court of Civil Appeals (Smoot's Rules of the Courts, p. 273); Clark v. Dyer, 16 S. W., 1061; International & G. N. R. Co. v. Glover, 84 S. W., 604; Gulf, C. & S. F. Ry. Co. v. Steele, 69 S. W., 171.

MR. CHIEF JUSTICE CURETON delivered the opinion of the court.

This suit was instituted by Reagan, the defendant in error, against the International-Great Northern Railroad Company, in the district court of Robertson county, for damages for the alleged destruction of a part of his cotton crop during the year 1929. It was alleged that Mineral creek runs through the field of defendant in error and under the plaintiff in error's railroad dump, and that the plaintiff in error failed to construct and maintain the necessary culverts, etc., as the natural lay of the land required for its necessary drainage, and that as a result thereof the waters from the creek, which overflowed its banks, were held back by the railroad embankment and caused to inundate and destroy the cotton of the defendant in error. The case was tried before the court without a jury, and the court in his findings of fact found that the company neglected and failed to construct and maintain the necessary culverts, and that as a result thereof twelve acres of cotton of the defendant in error were destroyed, and awarded damages for its destruction. The railroad company appealed the case to the Court of Civil Appeals, which reversed the judgment of the trial court because of the insufficiency of the evidence as to the amount or measure of damages. 36 S. W. (2d) 564. The case is before us on writ of error applied for by the railroad company.

The plaintiff in error insists that the petition of the defendant in error in the trial court based his cause of action wholly

on Revised Statutes, arts. 6328 and 7582a. The Court of Civil Appeals held that, aside from references to these statutees, the petition contained sufficient allegations to warrant recovery under the common law and independent of the statutes. We think there is some doubt about the sufficiency of the petition to authorize recovery independent of the statutes, but in the absence of special exceptions we give the petition the benefit of the doubt, and are inclined to agree with the Court of Civil Appeals. We granted the writ primarily because of the conflicts alleged, and because we had before us the case of Miller v. Letzerich, *post,* involving one of the statutes and to a certain extent the general subject of water control. The farm on which the damages here involved are alleged to have occurred is located in Robertson county, on the Jose de Jesus and Marano Grande and Francis Slauter surveys, the former of which, according to the official county map in the land office was "titled" in 1833, and the latter in 1841. These dates are not in the record, although the names of the surveys are shown; but since the case has been reversed, and that reversal is to be affirmed, we refer to the dates in order that certain features of this opinion may be rightly understood.

■■ We do not find it necessary to determine whether or not Revised Statutes, art. 6328, enacted in 1876, shall apply to constructions of the plaintiff in error here, erected in 1872 or 1873. We agree with the Court of Civil Appeals that, independent of this statute, liability for negligent construction may exist. That court in part said:

"Under the common law and independent of the statute, a railway company is liable for the damages caused by it by the negligent construction and maintenance of its roadbed. Houston & G. N. Ry. Co. v. Parker, 50 Texas, 330; Gulf, C. & S. F. Ry. Co. v. Helsley, 62 Texas, 593; Barstow Irr. Co. v. Black, 39 Texas Civ. App., 80, 86 S. W., 1036; Missouri, K. & T. Ry. Co. v. Tolbert (Texas Civil App.), 134 S. W., 280; 33 C. J., 326. If it so constructs or maintains its roadbed as to obstruct the flow of a well-defined channel and is guilty of negligence in doing so, it is liable for the damages caused as the proximate result thereof."

With this statement of the law we agree, except that the constructions complained of and a portion of the lands where the damage occurred may be on Mexican grants. If so, the rights of the parties in the absence of valid legislation to the contrary would be governed by the Mexican Civil Law. Miller z. Letzerich, *post.* However, this is not a matter of any

practical importance in this case, since, as we shall see later, the common law and the civil law, in so far as here involved, are the same.

■ The first question for determination is whether or not the waters causing the damages in issue are to be treated as surface waters, with the law applicable applied, or are to be regarded as the waters of a stream or drainage way, and the law applicable to the latter applied. We think the waters here involved were those of a substantial drainage way or stream, and that in determining the relative rights of the parties the law relative to drainage ways and streams must govern.

■ We do not take judicial knowledge of the dates of the patents above named, but we do of the general physiographic features of the county in which they are located, and have concluded that the map of Robertson county, made by the Land Office of the State of Texas, and the United States geological survey maps may bring before us those facts which we judicially know. Hoefs v. Short, 114 Texas, 501, 273 S. W., 785; Humphreys-Mexia Co. v. Arseneaux, 116 Texas, 603, 297 S. W., 225.

Robertson county, in which this land is located, lies between the Navasota river on the east and the Brazos river on the west, and the interfluve or divide between the two river systems passes approximately through the center of the county in a generally north and south direction. The county seat, Franklin, Owensville, and perhaps other towns are located on this ground. Many tributaries of the two rivers named rise on this divide. Those of the Navasota flow easterly into that river, and those of the Brazos pass westerly into it through the Little Brazos, its principal tributary in that section. The principal westerly flowing streams are: Campbells creek, Spring creek, Pinoak creek, Muddy creek, Walnut creek, and their tributaries. The easterly flowing streams are: Steel's creek, Duck creek, Mineral creek, Cedar creek, and Comb creek, and their tributaries. Mineral creek, the waters of which gave rise to this controversy, is a tributary of Duck creek, one of the principal easterly flowing streams, which rises on an extension of the Robertson county interfluve in Limestone county, runs southeasterly through Robertson county, all for a distance of about twenty-five miles, and enters the Navasota in the last-named county. The land involved is situated east of and near the town of Franklin, on the east slope of the divide previously referred to. A number of streams rise near the town of Franklin, flowing

in three different directions: east, west, and south,—and the land here involved is on Mineral creek, which flows in an easterly direction. It is obvious that Robertson county has a well-defined drainage system carrying the surplus waters which fall on the interfluve between the Brazos and Navasota rivers into these respective streams, and Mineral creek is a substantial member of this drainage system. Robertson county is located in that general belt of territory running north and south which we judicially know has a rainfall between 35 and 40 inches per annum. See "A Study of Rainfall in Texas," Bulletin No. 18, by B. F. Williams and Robert L. Lowery, Jr. (1929), of the State Reclamation Department. It is obvious from this that the drainage systems of the two rivers derive an enormous quantity of water from their Robertson county members. As for the drainage area of Mineral creek, one witness testified that its water-shed embraced from 2,500 to 3,000 acres; another some 1,280 acres; and still another named various farms which it drained. At any rate, it has a substantial water-shed, and in carrying away surplus rainfall performs a substantial service to the community. Assuming that the water-shed of Mineral creek is 2,500 acres of land, and that the rainfall would be the mean rainfall between the limits of 35 and 40 inches, that is $37\frac{1}{2}$ inches, it is obvious that a sufficient amount of water falls on this water-shed to create a lake, were it all to stand, 2,500 acres in area and more than three feet deep. Of course, all the rain does not fall at one time, nor does it in this instance stand on the land. The configuration of the terrain, type of soil, and other factors enter into the problem as to what amount of rainfall may pass into the earth and what amount may be taken up by streams in the form of run-off. Taking the world as a whole, it may be said, however, that about 22 per cent. of rainfall passes into the drainage systems, and through them into the sea. Cleland's Geology, chap. 3, p. 56. Applying this average to the rainfall of the drainage basin of Mineral creek, it is very clear that stream carries to the sea, in the form of run-off, not including that portion which of course may find its way into it from either wet weather or permanent springs, a very large amount of water. So, we feel that we are right when we say that however intermittent Mineral creek may be in its flow, it nevertheless performs a very substantial service to the community as a drainage way for surplus waters. The evidence does not disclose the length of this stream, although, as we understand some of the witnesses, a length of several miles is shown. The United States Geological Survey states

that it has a length of some nine miles. Water Supply Paper No. 448, p. 157, Gazetteer of the Streams of Texas, United States Geological Survey. The official county map shows approximately the same length for the stream. The regimen of the stream, its physiographic features, and the physiographic features of its valley have not been fully developed in the record, but this much appears: Through the land in controversy, which is near the head of the stream, it has a well defined bed of from twelve to twenty feet in width, with well defined banks from two to two and one-half feet high, with trees and shrubs growing adjacent thereto. Mineral creek has its attendant valley through which it meanders, as do other streams which flow through the same type of soil. The meanders are not pronounced through the land of the defendant in error, because quite near the origin of the stream, or for some other natural cause, but after leaving the defendant in error's land for still lower ground, the meanders become more pronounced, the stream way larger, and the banks deeper. The gradient through defendant in error's land is a low one, but the water comes from higher ground, and evidently traverses his premises with considerable force during periods of rainfall. Whether or not Mineral creek contains living water from a permanent ground source, such as springs, is not clear from the evidence. One witness said it was not a running branch through defendant in error's land, although when the railroad engineer, a witness in this case, made his survey in February, 1930, it contained water at the bridge. We know, of course, that it has a source of permanent water supply in the seasonal and copious rains of that region. The old town of Englewood was located on this creek, and the crossing here involved is known as the old Englewood Crossing. So, evidently the features of the creek were such that the place of passage of the road assumed definite characteristics and bore a definite name. The railroad company built a bridge eighty-three feet long across the creek.

█ We think it a fair deduction to say that Mineral creek is a substantial stream, having tributaries, and that it is well and definitely marked on the ground, with its own channel, banks, and valley; that it carries a great deal of water during periods of rainfall; contains water at seasonal times at least, and on the whole performs a necessary drainage service for a large territory, making its water-shed tillable and habitable; and that it is not a mere rivulet into which surface water is gathered from a diffused state before it enters some stream way on its journey to the sea. We think that when surface waters have entered

Mineral creek they have ceased to be surface waters, but, controlled and regulated by its bed and banks, definitely carved in its attendant . valley, they have come together from their previously diffused state and are finally on their journey to the ocean; in other words, that the waters of Mineral creek are waters of a stream, and not surface waters. We do not mean to say that Mineral creek is a stream to which riparian or statutory water rights may attach. That question is not before us, and depends on other factors not here involved. What we intend to hold is that the waters of Mineral creek are not mere surface waters, but are the waters of a substantial natural drainage way, to be governed by the law applicable to streams, as distinguished from the law which governs surface waters. Authorities *post*.

■ The railroad company, when it took title to the lands upon which it placed its railway embankment, took that title (whether an easement or in fee) charged with the burden of permitting the waters of Mineral creek to flow through the same unimpeded by embankments, in such a manner as not to injure the upper proprietor (the defendant in error), even though the creek sometimes overflowed its banks, as do all Texas creeks. So, when the Railroad Company's embankment was first constructed, in 1872 or 1873, before article 6328 was enacted by the Legislature, the Railroad Company owed the owner of the dominant estate the duty of so constructing its railway embankment that the waters of Mineral creek, except in cases of extraordinary or accidental floods, would pass through and not be impounded on the lands now owned by the defendant in error. This rule, characteristic of both the civil and common law, needed no statute for its sanction, and if the Railroad Company negligently failed to so construct its railway embankment so as to permit the waters of Mineral creek to pass, or if it negligently constructed the embankment so as to dam the waters of this stream and overflow defendant in error's land, to his damage, then the Company is liable under the civil law, the common law, and the "common enemy doctrine." Authorities supra; Hoefs v. Short, 114 Texas, 501, 273 S. W., 785; Gramann v. Eicholtz, 81 S. W., 756; Batla v. Goodell, 115 S. W., 622; Booker v. McBride, 40 S. W., 1031; Farnham on Waters, vol. 3, sec. 889d, sec. 889b; Gould on Waters (3d ed.), sec. 263, p. 536, sec. 264; 27 Ruling Case Law, p. 1063, sec. 3, p. 1066, sec. 6, p. 1147, sec. 77; Soules v. N. P. Ry. Co., 34 N. D., 7; L. R. A. 1917A, p. 501; McClure v. City of Red Wing, 28 Minn., 186, 9 N. W., 767; Conniff v. City and County of San Francisco,

67 Calif., 45, 7 Pac., 41; York v. Davidson, 39 Or., 81, 65 Pac., 819; Earl v. DeHart, 12 N. J. Eq., 280, 72 Am. Dec., 395; Palmer v. Waddell, 22 Kan., 352; Aldritt v. Fleischauer, 74 Neb., 66, 70 L. R. A., 301; Quinn v. Chicago, M. & St. P. R. R., 23 S. D., 126, 120 N. W., 884, 22 L. R. A. (N. S.), 789; Mace v. Mace, 40 Or., 586, 67 Pac., 660.

We do not deem it necessary to discuss or quote from the authorities that a railroad company can not dam back the waters of a stream to the injury of an adjacent land-owner. We will quote only from those which primarily show that the law of stream waters should be applied to Mineral creek.

In the case of Hoefs v. Short, supra, this court in discussing the question as to whether or not the waters of Barilla creek were surface or stream waters in part said:

"The major contention of the defendants is that the waters of Barilla Creek are mere surface waters, to which water rights do not attach.

"It is obvious from the evidence that this defense is untenable. The waters of Barilla Creek are not diffused over the surface of the ground, but are accustomed to flow in a well-defined channel, in a stream, which, though intermittent as to flow, has a well-defined and permanent existence. They are therefore not surface waters, but are the waters of a stream. 27 Ruling Case Law, p. 1137; 3 Farnham on Waters, sec. 878; 1 Kinney on Irrigation, sec. 318."

Gould on Waters, cited above, states:

"Surface water may be said to form a watercourse at the point where it begins to form a reasonably well-defined channel with bed, banks or sides, and current, although the stream itself may be very small, and the water may not flow continuously; and surface water ceases to be such after entering within the banks of a watercourse, or forming a lake.

\* \* \* \*

"In broken regions of country, intersected by long, deep ravines, or surrounded by high, steep hills or bluffs, down which large quantities of water from rain or melting snow rush rapidly, often attaining the volume of a small river, and usually following a well-defined channel, the common-law rules applicable to ordinary surface water do not necessarily apply. In many respects such waters partake more of the nature of natural streams than of ordinary surface water, and, to a certain extent, are governed by the same rules; and no one has a right to obstruct or divert such waters so as to cast them upon the property of others to their injury. But in general, in order

to constitute a watercourse, the channel and banks formed by the flowing of the water must present to the eye, on a casual glance, the unmistakable evidences of the frequent action of running water." (Pages 536, 537, 538).

Ruling Case Law in part declares:

"Again, while the term 'watercourse' does not include water descending from hills, down hollows and ravines, only in times of rain and melting snow, yet where water, owing to the hilly and mountainous configuration of the country, accumulates in large quantities from such causes, and at regular seasons descends through long, deep gullies or ravines on the land below, and in its onward flow carves out a distinct and well defined channel, which bears the unmistakable impress of the frequent action of running water, and through which it has flowed from time immemorial,—such stream constitutes a watercourse, and is governed by the rules applicable thereto." (P. 1063, sec, 3, vol. 27).

"There is apparently some authority to the effect that in order to constitute a watercourse, the source of supply must be more permanent than mere surface water, but it is not satisfactory to conclude that no watercourse exists merely because the source is what is known as surface water. The question is not to be determined alone from the origin of the water, for streams may be composed wholly of surface water or that which falls in the shape of rain or snow; and even surface water becomes a natural watercourse at the point where it begins to form a reasonably well defined channel, with bed and banks, or sides and current, although the stream itself may be very small and the water may not flow continuously." (P. 1066, sec. 6, vol. 27).

On the duty of the owner of the lower estate to construct sufficient openings in embankments across streams such as Mineral creek, the last authority quoted from declares:

"With regard to the question whether the owner of a lower tenement may obstruct surface water running in a natural drainway, thereby causing such water to flow back on the upper proprietor, there has been much legal discussion and a corresponding conflict of opinion. In some jurisdictions, the courts, professing an adherence to the so-called common law rule, held or recognized that the lower landowner may obstruct the flow of surface water in a swale, gulch, or other natural drainway, without incurring liability to the upper proprietor for injuries caused by the backing up of such water. The great weight of authority, however, is to the effect that

both under the civil law rule as to surface waters and under the so-called common law or common enemy rule, a natural drainway must be kept open to carry the water into the streams, and as against the rights of the upper proprietor, the lower proprietor cannot obstruct surface water when it has found its way to and is running in a natural drainage channel or depression. Thus it has been held that it is the duty of a lower landowner who builds a structure across a natural drainway to provide for the natural passage through such obstruction of all of the water which may be reasonably anticipated to drain therein, and this is a continuing duty." 27 Ruling Case Law, p. 1147, sec. 77, and many cases cited in the notes.

Mr. Farnham, in his profound work on Water Rights, vol. 3, sec. 889d, declares:

"The question of the right to obstruct a natural drainage channel has been needlessly complicated with the further question whether or not a water course existed. The rules with respect to water courses form a distinct class by themselves, and were formulated to conserve the interests of the riparian owners. On the other hand, the question of drainage involves, not only the welfare of the individual landowner, but also that of the community in so far as its healthfulness and prosperity depend upon relieving land of stagnant water and improving its productiveness. Before man owned any parcel of land nature had impressed upon it certain characteristics. So far as these can be changed without interfering with the use or enjoyment of neighboring property, they may be changed at will. But, so far as one parcel has been subjected by nature to a servitude in favor of an adjoining parcel, the enjoyment of which will be materially injured by destroying the servitude, it would seem that the rule by which a purchaser of property is bound by its condition when he acquires title would prevent the destruction of such servitude. In order to be within the operation of this rule, the servitude must be clearly and permanently impressed upon the property so as to be plainly visible to the intending purchaser. Under this rule, the great weight of authority is in favor of the proposition that a lower proprietor cannot place any obstruction in an obvious drainage channel which has been formed by nature and carries the water from a higher to a lower estate. Some courts have reached the same result by holding that channels formed by surface water might be water courses, and have applied to them the rule governing the obstruction of such courses, and in some cases there is no doubt that channels which now carry merely surface water were once

living streams. When the country was covered with forest so that the ground was more nearly saturated with water, springs came to the surface and fed streams which flowed more or less constantly down these channels, but, as the land was cleared, and brought under cultivation, the springs gradually lost their strength, and finally disappeared so that the channels which formerly carried the streams flowing from them now receive only the water which comes from surface drainage. But there is no reason why, if the rule of water courses rather than that of drainage is to be applied, it should not be applied to this class of channels. That these drainage channels cannot be obstructed is supported by the great weight of authority. It is the rule in England, Canada, Ireland, Alabama, California, Delaware, Georgia, Illinois, Iowa, Kentucky, Louisiana, Maryland, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Jersey, North Carolina, Ohio, Oregon, Pennsylvania, Tennessee, Texas, Virginia, Vermont, and West Virginia."

The case of McClure v. City of Red Wing, 28 Minn., 186, 9 N. W., 767, involved the question as to whether or not a ravine was to be considered a natural water course for drainage purposes, and the Supreme Court of Minnesota held that it was. The facts were that:

"Within the city of Red Wing is a ravine some three rods wide, on either side of which is a hill 15 or 20 feet high. In the bottom of this ravine is a well-defined natural channel or water-course from six to eight feet wide and from four to five feet deep. Into the ravine center two other ravines, each about a mile and a half long. The surface of the country drained by these ravines is hilly and broken. In time of rains or melting snows all the water from this tract of country flows down the first named ravine, following the water-course or channel referred to, and emptying into the Mississippi river. This is its only outlet. In time of heavy rains or storms the volume of water is often large and rapid. In the absence of snow or rain this channel is usually dry. The city of Red Wing laid out and graded a street along and across this ravine, and in doing so dammed and obstructed the natural channel for this water, and undertook to divert it into a sewer which they constructed under the street."

In discussing the question the court in part said:

"We do not deem it necessary to determine whether this was a 'natural water-course,' or mere 'surface' water, under the legal definitions of these terms. If it be surface water, the general common-law doctrine that neither the retention nor

repulsion of surface water is an actionable injury must necessarily be materially modified in such cases. In a broken and bluffy region of country, like that part of southeastern Minnesota adjacent to the Mississippi river and its tributaries, intersected by long, deep coolies or ravines, surrounded by high, steep hills or bluffs, down which large quantities of water from rain or melting snow rush with the rapidity of a torrent, often attaining the volume of a small river, and usually following a well-defined channel, it would be manifestly inappropriate and unjust to apply the rules of common law applicable to ordinary surface water. In many respects such streams partake more of the nature of natural streams than of ordinary surface water, and must, at least to a certain extent, be governed by the same rules. Bowlsby v. Speer, 31 N. J. Law Rep., 351; Grand Junction Canal Co. v. Shugor, L. R. 6 Ch. App., 483.

"The true rule to adopt in such cases is that no one has a right to obstruct or divert such waters so as to cast them upon the property of others to their injury. When, in the judgment of a municipal corporation, it becomes necessary in making a public improvement to obstruct the natural channel of such a stream, or to divert it into a sewer or other artificial channel, it is bound to provide adequate and proper culverts, sewers, or other artificial channels, to carry off the water without injury to the property of others, and to exercise reasonable skill, care, and judgment in so doing; and if they fail to exercise such reasonable care, skill, and judgment, they will be liable if injury ensues to others. They have no absolute right in such cases to dam up the natural channel, and divert the water by artificial means upon private property. If any such right is necessary for public purposes, they must obtain it by the exercise of the right of eminent domain, as in any other case of taking private property for public uses. O'Brien v. City of St. Paul, 25 Minn., 331; Van Pelt v. City of Davenport, 42 Iowa, 308."

In the case of Soules v. Northern Pacific Railway Co., 34 N. D., 7 L. R. A., 1917A, p. 501, the suit was for damages for flooding property by means of a railway embankment. The Supreme Court of North Dakota in stating the original of the injury said:

"It is not, we believe, contended in this case that the flooding of the plaintiffs' premises in question was occasioned by the obstruction of a flowing stream, but rather by the obstruction of a natural watercourse which served as a natural drainage for surface and storm waters, and which, on the occasion in

question, was flooded by a heavy rainstorm which occurred on the night of July 28, 1914, and in early morning of July 29, 1914."

The court then adverts to the rules of the common and civil law as to surface waters, but declined to apply either rule on the ground that the depression in question was a natural drainway and should be kept open. The court in part said:

"Nor is it necessary to adopt either rule in the case which is before us, as we are convinced that there is in the record, and that there was properly submitted to the jury, evidence which tends to show that the swale, depression, or whatever it may have been in the case before us, was a 'natural drain way.' If it was a natural drain way, it is immaterial whether the so-called common-enemy or the civil-law rule as to surface waters prevail in North Dakota, as both 'under the civil-law and the English common * * * (enemy theories) the rule is that the natural drain ways must be kept open to carry the water into the streams, and that the lower estate is subject to a natural servitude for that purpose.' 3 Farnham, Waters, p. 2555.

"The building of the plaintiffs face south on Villard street. Villard street runs east and west and a block or so north of and parallel to the railroad tracks. There is evidence in the record tending to show that the ditch or ravine which runs from Villard street to the railroad track, and which empties through the culvert of the railway company and underneath its tracks, has been in existence for some thirty years, and, although only extending a short distance north of Villard street, and some three or four blocks north of the railroad track, served as a natural runway or drain for a larger natural drainage basin of some 160 acres which extended to the northeast. There is also evidence which tends to show that this ditch has now, and for a long time prior to the flood in controversy had, a well-defined channel, and that, though grass grew at its sides, that grass had at its bottom been worn away to a breadth of 3 or 4 feet by the running waters. It is true that there is no evidence or pretense that the water ran in this ditch all of the time, or even usually ran in this ditch, but there is evidence that it ran therein whenever there were heavy rains and when the snow melted in the spring. Such being the case, it is clear that the ditch or ravine, though not a stream, was nevertheless a natural drain way which drained a more or less extended area of land or drainage basin into the Heart river. It is clear also that, though the railway company had the right to build

an embankment across it, it nevertheless owed the duty to the landowners in the drainage basin to do so in such a manner that the water which could be reasonably anticipated to flow therein and to be drained thereby could be as well accommodated before the construction of its improvements. This is true under both the civil-law and the so-called common-enemy theory of surface waters."

Concluding with reference to the drainway involved, the court declared:

"Being, then, a natural drain way, it was the duty of the defendant railway company to accommodate itself to and to provide for the undisturbed passage through it of all of the water which was or might be reasonably anticipated to drain therein, and this duty was a continuing duty."

Our conclusion is that Mineral creek was such a drainage way or stream as that under either the civil law or common law, independent of R. S., art. 6328, the railroad company is liable for all damages due to actionable negligence in the construction and maintenance of its embankment, as declared by the Court of Civil Appeals.

██ Thus far we have treated the waters of Mineral creek as the waters of a substantial drainage way or stream, and not as surface waters. We do not know, of course, what the facts may show on another trial. For that reason we will now state the rule as to surface waters. If for any reason the waters of Mineral creek should be regarded as surface waters, the result to the plaintiff in error in this case would be the same, in the event the constructions complained of and the property damaged was on a Mexican grant. The defendant in error has the right, as the owner of the dominant estate, to have the surface waters pass as a part of his grant, under the civil law, off and on to the servient estate, without injury to his land. This was the rule under the civil law. Miller v. Letzerich, *post*. But, aside from this, article 7589a, the Surface Water Act, is applicable. This act we have just held valid and constitutional, applicable to constructions made both before and subsequent to its passage. Miller v. Letzerich, supra; Chicago & Alton R. R. Co. v. Tranbarger, 238 U. S., 67; Tranbarger v. Chicago & Alton R. R. Co., 250 Mo., 46, 156 S. W., 694. We deem it unnecessary to here restate our reasons in support of the validity of the act.

The judgment of the Court of Civil Appeals, reversing that of the district court, is affirmed.