Joe CROW, Appellant,

v.

STATE of Texas et al., Appellees.

No. 10653.

Court of Civil Appeals of Texas.

Austin.

May 6, 1959.

Rehearing Denied June 24, 1959.

David L. Tisinger, Warner A. Hancock, Austin, for appellant.

Will Wilson, Atty. Gen., Marvin R. Thomas, Jr., Riley Eugene Fletcher, Asst. Attys. Gen., for appellees.

PER CURIAM.

This is a suit brought by appellant, Joe Crow, against appellees, the State, the State Highway Department, its individual members and the Highway Engineer, to recover compensation for the taking of or damage to property under Texas Constitution, Art. 1, Sec. 17, Vernon's Ann.St. The Legislature granted appellant permission to bring the suit on April 5, 1954, by House Concurrent Resolution No. 30.

In 1951 appellant purchased a tract of land in Travis County containing 61 acres, more or less. The trace is bounded on the east by Burnet Road which was formerly designated as U. S. Highway 183 and prior to that as State Highway 29. During the period from February, 1947 to March, 1948 the Highway Department, caused improvements, additions and alterations to be constructed on the above highway adjacent to the property purchased by appellant.

Prior to this construction and in 1941 a deed from Chas. J. Anderson and wife, the then owners of the above land and appellant's grantors, was secured. This deed recited a consideration of $13 and conveyed a tract of land 60 feet by 192 feet described as "lying within the limits of the right of way of relocated State Highway 29" and containing .046 acres. This tract was out of the southeast portion of the Anderson land. This deed also provided that:

"The undersigned grantor herein for the same consideration hereby specially agree that the consideration above recited includes adequate and complete compensation for any and all damages, present or future, that may be done to the remainder of the tract above referred to and in consideration of the premises and the

payment to us of the sum of money above acknowledged, we hereby release the State of Texas from any and all damages, if any, present or future, that may be lawfully done to the remainder of our said tract of land by virtue of the construction and maintenance of the new proposed Highway No. 29, or by virtue of any lawful drainage in connection therewith or by virtue of any lawful operations of any nature in connection with said road and its appurtenances."

As material here the improvements and alterations consisted of the removal of two metal culverts running from east to west under then Highway 29 and adjacent to the Anderson property. These metal culverts were 24 inches in diameter and in their place a concrete culvert was constructed which consisted of two channels each being five feet wide and three feet high. At this time there was an earthen dike along the east boundary of the Anderson land it having been placed there by Anderson's grantor.

It was alleged that no damage had resulted to the land from water draining onto it until after appellant acquired it and further that water from the northeast and east was diverted through the concrete culvert onto appellant's land causing the damage here sued for.

A jury trial was had and 14 special issues were submitted. However due to findings and instructions only six were answered. The jury answered: (1) that prior to appellant's purchase of the land there had not been any substantial injury to it; (2) that drainage from the highway did not do substantial injury to appellant's land after he purchased it; (8) that the parties to the right of way deed intended to release damages caused by an unnatural diversion of water onto the land; (9) that at the time the Andersons signed the right of way deed and at the time the State accepted it the parties reasonably foresaw the diversion of water from the highway onto

the land; (10) that prior to his purchase appellant was not aware of potential damage to the land from overflow by water, and (11) that prior to the construction of Highway 29 the natural drainage of water was down the barrow ditches on the east side of the land. On these findings of the jury a judgment that appellant take nothing was rendered.

Appellant here presents two points to the effect that the jury's answers to issues two, eight and nine are contrary to the great weight of the evidence if not to the uncontradicted and undisputed evidence and are not supported by evidence having probative value for which reasons the trial court erred in overruling his motion for judgment non obstante veredicto and in overruling his motion for a new trial. By one counterpoint appellees join issue with appellant on his two points supra.

There is no controversy as to the jury's answers to issues one, ten and eleven. Also we note that issues two and nine inquire respectively as to drainage and diversion of water from the highway and issue eight inquires as to the unnatural diversion of water onto the land. The parties here treat the jury's findings as relating to the drainage of water from the areas to the east and northeast of appellant's land. In our consideration of the evidence we will do the same as there is no dispute that water from the areas to the northeast and east drained to the east side of the highway. The dispute is as to the discharge of this water onto appellant's land through the concrete culvert and resulting damage.

The evidence shows without dispute that, the highway not considered, the natural drainage of surface water is from the northeast and east to the southwest and west across appellant's property. Also that there is drainage of surface water from an area of from 300 to 356 acres of land to the east side of the highway. Prior to the construction of old Highway 29 there was a county road along its route. The evidence also shows that prior to the alleged damage

in question there was no overflow of the dike along the east boundary of the land.

Mr. Fincher, the engineer in charge of the engineering work at the time the culvert in question was constructed, testified that he never saw water from the culvert go over the earthen dike along the boundary of the Anderson property; that looking southwest from the culvert there was a slight drain or swale across the land which was pasture and sodded and said:

"I don't recall any defined ditch in it, but there was a low where water before that had drained that way. * * *

"Q. Did you in your function as Highway Engineer for the Highway Department direct that an easement be obtained from the Andersons from the culvert across the property on that diagonal? A. My memory is that I sent my assistant to see Mr. Anderson to see if we could get an easement across his property, and we were unable to get that easement to take that water down that drain.

"Q. Did you want to get an easement so that you could let water come out of the culvert and across Mr. Crow's property in that little swale that you are talking about? A. That was Mr. Anderson's then.

"Q. You wanted the easement, but you were not able to get it. A. That's right."

He located the concrete culvert in question as being at the northeast quarter of the Joe Crow property and said that he left the Highway Department in 1954.

Chas. J. Anderson testified that he owned the land from 1910 until he sold it to appellant in 1951; that during all of that time there was an earthen dike along the east boundary and that water never overflowed

it and that at the time he sold the land to appellant there was no wash across it but that there is one now. Mrs. Anderson gave testimony which was substantially the same as that given by Mr. Anderson.

The witness Archer testified that he leased the land in 1951 for grazing and for farming; that at that time the drainage had not damaged the land and did not interfere with his farming operations but that about 1952 his corn crop was damaged along the "wash" which had not been there prior to that time.

Appellant testified that at the time he bought the land there were no washed or eroded areas across it and that there is now.

Mr. Kellersberger, a civil engineer, testified that the drainage of water from the area northeast and east of the highway, which he said was about 336 acres, was diverted to appellant's land through the concrete culvert. He said he was on the land in 1954 and made a topographical survey of it. This map was introduced in evidence and was explained by him. It shows a washed and eroded area connected with the concrete culvert and extending across appellant's land to the southwest. He computed this area as being about ten acres, varying in width from 500 to 160 feet and varying in depth from 3.4 to 1.7 feet. He testified that before the culvert was there that the water from the area to the east and northeast would tend to drain down the east side of the highway and that the culvert diverted it to the west side.[1]

We quote from the testimony of Mr. Ed Bluestein, District Engineer of the Austin District of the Texas Highway Department who testified for the State:

"Q. Mr. Bluestein, did you have occasion to go out and look at this prop-

---

1. The above portion of this opinion was prepared by Associate Justice Gray who in the full opinion prepared by him for the Court reached the conclusion, inter alia, that the answer of the jury to Special Issue No. 2 was contrary to the weight of the evidence.

erty this past week? A. Yes, sir, I did.

\* \* \* \* \* \*

"Q. Did you look at the property from more than one point? A. I looked it and crossed over into the property and got a few grass-burs and needle-grass, I think, yes, sir.

"Q. Now, tell us about the drainage on the property there. You may use this map, Plaintiff's Exhibit No. 10. A. These are contours drawn at one foot intervals apparently, showing the grade of that highway, just the natural ground, is Elevation 724 over on this northeast corner of the tract of ground, and coming on down it drops to about 704, which is a twenty foot fall from the northeast corner to the southwest corner of that tract of ground.

"Q. Is that also fairly visible to the naked eye, that the land slopes in that direction? A. Yes, sir; it is easily detected that the land slopes away from the highway.

"Q. Did you have occasion to look at the culvert up near the northeast corner of the property? A. Yes, sir; we looked at that culvert, also.

"Q. Did you see where the water comes through the culvert? A. Yes, sir.

"Q. What kind of drainage leads from there, if any, across the property? A. There is what appears to be a natural drain. I don't know, Mr. Fletcher, just what—

"Q. The place you noticed there just inside his property from the culvert there, is it deeply rutted? Is it shallow? Is it wide? Is it narrow? A. There was no evidence of any kind of any erosion. There were no gullies. Of course, it is all in pasture and the water apparently just went down its natural course with no damage of any kind.

"Q. Did you find any other natural drainage places across that northeast corner? A. Yes, sir. We wandered down the Burnet Road to the south and there were two or three others that really looked more pronounced, and this contour map, of course, picks them out. At 300 feet here is another series of contours that shows a natural drain, and a little further there is another one. The contours also show here the Burnet Road at about 718. That is inside the property. That is on the property proper and near the southeast corner of the tract, as compared with 704 at the southwest corner. In other words, that is a fourteen foot fall down here, as compared to a twenty foot diagonally. \* \* \*

"Q. Now, Mr. Bluestein, is that property covered in grass? A. Well, it is grass and weeds—just vegetation, I would say.

"Q. Pretty tall, some of it? A. Well, it probably had not been mowed in a long time.

"Q. How long were you out there? A. I think—what is today?

"Q. This is Tuesday. A. I think that was last Friday.

"Q. Didn't you see about 300 feet inside the property several acres had been mowed? A. No, sir, I didn't.

"Q. You didn't notice that? A. No, sir.

"Q. How deep did you go into the property? A. I went in about 50 feet, I would guess.

"Q. Mr. Bluestein, as far as you know, are these computations here by Mr. Kellersberger of widths of 300 to 500 feet, are there depressions in that wash of two and a half feet in depth to three and a half feet in depth? A. Is that on the property under discussion, Mr. Tisinger?

"Q. Yes, sir. A. I couldn't vouch for that, Mr. Tisinger.

"Q. Could you deny it? A. I couldn't vouch for it.

"Q. Well, you don't have any data to dispute it, do you Mr. Bluestein? A. I have no data to dispute it or affirm it, Mr. Tisinger.

"Q. How long did you stay there, Mr. Bluestein? A. When we were looking at this property?

"Q. Yes. A. I guess thirty minutes.

"Q. Now, it is in evidence that Mr. Kellersberger got the data showing this wash in June of 1954. You were still maintaining the property at that time, weren't you? A. I believe that's right.

"Q. Now, you referred to that wash as a natural drain, and you referred to another one down towards the center of the property as a natural drain. Now, Mr. Bluestein, you don't know when those water courses were created, do you? A. I would answer that, Mr. Tisinger, by saying I do not; but these contours indicate that the slope of the land has been that way for years and years.

"Q. It is in evidence from Mr. Fincher, one of your former engineers, that when he was in charge he did not ever see any water cross that dike. Now, you never saw any water cross that dike, did you, Mr. Bluestein? A. I have been by there on occasions when it was raining, and I think water was going practically everywhere.

"Q. When was the first time you saw it? A. I don't know exactly. The last year and a half it has been continually raining to a considerable excess, and I think during that time I have seen that Burnet Road flooded, including that section there.

"Q. In any event, when you saw it with the water going over it, it would be at some time since 1952? A. Yes, sir. I was not here prior to that. It would have to be after that.

\* \* \* \* \* \*

"Q. In other words, you do not think the ditch on the east side of the Burnet Highway and that culvert tends to create any more water going across Mr. Crow's property? A. No, sir, I do not."

It is our opinion that the evidence as a whole does not so preponderate as to condemn the answer of the jury to Special Issue No. 2 as being clearly wrong or manifestly unjust. It seems to us to raise a typical and exclusive jury issue. Credible and qualified witnesses testified for both sides and it was for the jury to consider their interests, motives, appearance and the conflict in their testimony in the light of the jury's experience and common knowledge and to arrive at a just and fair verdict. This we believe the jury has done.

In view of this conclusion it is not necessary that we consider or decide any other question presented by the parties and we do not do so.

The judgment of the trial court is affirmed.

Affirmed.

GRAY, Justice (dissenting).

I do not agree with the conclusion reached by the majority. It is my opinion that the answers of the jury to issues two, eight and nine cannot be sustained and that such answers are subject to all of appellant's complaints. It is also my opinion that the quoted release is not a defense to the damage alleged.

The appellees called two witnesses. One was an attorney who did not testify to facts material to the issue of drainage and diversion of water. The other was Mr. Bluestein, the Engineer for the Austin

District of the Highway Department, who testified that he came to Travis County in 1952 and that he was familiar with the property in question. He said that during the week prior to the trial he and parties (who were not called to testify) went out and looked at the property. He was asked and testified as follows:

"Q. The place you noticed there just inside his property from the culvert there, is it deeply rutted? Is it shallow? Is it wide? Is it narrow? A. There was no evidence of any kind of any erosion. There were no gullies. Of course, it is all in pasture and the water apparently just went down its natural course with no damage of any kind."

Prior thereto he was asked:

"Q. Now, tell us about the drainage on the property there. You may use this map, Plaintiff's Exhibit No. 10."

Plaintiff's Exhibit 10 is the map prepared by Mr. Kellersberger and referred to supra. He then proceeded to testify as to the slopes shown on the map and said that the slope of the land was visible to the naked eye. On cross-examination he said that he had never seen the property prior to 1952; that at the time of his visit to it he "guessed" he stayed on it 30 minutes and "guessed" he went into it about 50 feet. He would neither deny nor affirm Exhibit 10 and said: "I have no data to dispute it or affirm it."

Mr. Bluestein said that if the highway and the culvert were not there that equally as much if not more water "would hit Crow's property as hits it now" and that he did not think that the ditch on the east side of the highway and the culvert tended "to create" more water going across the property.

In the testimony of this witness as quoted by the majority he refers to conditions found at the southeast corner of the property. This area is not the subject of inquiry here and is the subject of, and is explained by, a deed from Chas. J. Anderson to Geo. S. Mathews, County Judge of Travis County, dated April 8, 1921, whereby for a consideration of $150 Chas. J. Anderson conveyed:

"An Easement of water right of way twenty feet by seventy-five yards running diagonally south from culvert on Upper Georgetown Road to Spicewood Road following course of drainage ditch the same being twenty feet by seventy-five yards out of the southeast corner of that tract of land out of the Geo. W. Davis Survey * * *. Also a strip of land out of said Survey hereinabove described 4 feet in width by 340 yards in length being that strip of land out of said Survey and out of the tract of land owned by Chas. J. Anderson which is now embraced in the right of way on the Upper Georgetown Road."

As quoted by the majority this witness also said:

"A. I have been by there on occasions when it was raining, and I think water was going practically everywhere.

"Q. When was the first time you saw it? A. I don't know exactly. The last year and a half it has been continually raining to a considerable excess, and I think during that time I have seen that Burnet Road flooded, including that section there.

"Q. In any event, when you saw it with the water going over it, it would be at some time since 1952? A. Yes, sir. I was not here prior to that. It would have to be after that."

This quoted testimony confirms and does not dispute the testimony of the other witnesses.

The inquiry here is not limited to the natural drainage. All witnesses agree that the natural drainage is to the southwest and across appellant's property.

Also the evidence all shows that the surface water from the east drains through the concrete culvert and onto appellant's land. The witness Bluestein did not deny that the flow of the water was concentrated through this culvert and he did not deny the map prepared by Mr. Kellersberger although he was asked about it on cross-examination and testified from it on direct and redirect examination.

Evidence to support the jury's answer to issue two must be found, if at all, in the testimony of the witness Bluestein. His testimony agrees with all witnesses that surface water from an area (estimated to be from 300 to 356 acres) drains to the southwest to the highway and towards appellant's land. There is no dispute as to the location of the culvert and that the above water goes through the culvert to reach the land. Plaintiff's Exhibit 10, supra, shows the washed and eroded area detailed supra. When this exhibit was shown to Bluestein he did not deny the existence of this washed and eroded area and when directly asked about this area he said "I have no data to dispute it or affirm it" although he had just before testified on direct examination as quoted supra which is the only testimony to dispute the detailed testimony of all other witnesses.

I, of course, do not undertake to pass on the credibility of the witnesses, resolve the conflicts in the testimony or say that the testimony of a number of witnesses preponderated over that of one witness; however, it is my opinion that it is our duty to determine whether the answer of the jury is supported by the evidence and to test the reasonableness of the conclusion reached by the jury "by the inherent soundness or reasonableness of the conclusion itself." Gulf, C. & S. F. Ry. Co. v. Gaddis, Tex.Com.App., 208 S.W. 895, 897. In doing this we are not to "ignore physical conditions by which a witness is circumstanced or the maxima potentialities of his vision." Blum Milling Co. v. Moore-Seaver Grain Co., Tex.Com.App., 277 S.W. 78, 83.

The question propounded to the witness Bluestein quoted supra inquired as to the condition of Crow's property "just inside from the culvert." At most he inspected the property for about 50 feet and he said the property was covered in grass and weeds.

Appellant's pleadings do not allege damages limited to the area "just inside his property from the culvert," and the witnesses did not so limit the washed and eroded area. Even if it be said that Bluestein's testimony is some evidence in support of the jury's finding, it must be limited to the area about which he testified and cannot be extended to areas he did not inspect and which weeds and grass kept from his vision.

The Surface Water Act, 7589a, Vernon's Ann.Civ.St., provides:

"It shall hereafter be unlawful for any person, firm or private corporation to divert the natural flow of the surface waters in this State or to permit a diversion thereof caused by him to continue after the passage of this Act or to impound such waters, or to permit the impounding thereof caused by him to continue after the passage of this Act in such manner as to damage the property of another, by the overflow of such water so diverted or impounded, and that in all such cases the injured party shall have remedies, both at law and in equity, including damages occasioned thereby, provided that the passage of this Act shall in no way affect the construction and maintenance of levees and other improvements for the purpose of controlling, floods, overflows and freshets in rivers, creeks and streams, nor the construction of canals for conveying water for irrigation or other purposes; and provided that nothing in this Act shall be so construed as to authorize or give authority to persons

or private corporations owning or constructing canals for irrigation or other purposes, to construct or maintain any canal, lateral canal or ditch in such manner as to obstruct any river, creek, bayou, gully, slough, ditch or other well defined natural drainage; and provided further where gullies or sloughs have cut away or intersect the banks of rivers or creeks so as to permit the escape of flood waters from such rivers or creeks, through such gullies or sloughs on to land adjacent to such streams, the owner of such land may fill the mouth of such gullies or sloughs to the height of the adjoining banks of such rivers or creeks without liability in damages to other property owners."

The above Act does not name the State or the Highway Department and does not except either from its operation. Although it is not necessary to here, and I do not, decide whether it is applicable to the cause of action alleged, I do think it is persuasive in determining the meaning of the word "lawful" as used in the release supra. The provision of the Act is consistent with the holdings of the decisions herein cited and as is said in International-Great Northern R. Co. v. Reagan, 121 Tex. 233, 49 S.W.2d 414, 418, "This rule, characteristic of both the civil and common law, needed no statute for its sanction." In State v. Hale, 136 Tex. 29, 146 S.W.2d 731, a judgment was affirmed which awarded damages for the overflow of land caused by an obstruction built by the Highway Department and which obstructed the natural flow of flood waters that theretofore had passed unimpeded over an old roadway. It was there held that the complained of act constituted a taking or damaging of property for public use under Texas Constitution, Art. 1, Sec. 17. Also in State v. Malone, Tex.Civ.App., 168 S.W.2d 292, Er. ref. w. m., a judgment was affirmed which awarded damages caused by the construction of a high-

way without providing sufficient drainage for surface water.

The cause of action here alleged is clearly one for damages for collecting surface water and casting it in increased and unnatural quantities through the culvert onto appellant's land for which an action for damages will lie. Miller v. Letzerich, 121 Tex. 248, 49 S.W.2d 404, 85 A.L.R. 451. And such action may be maintained even if the surface water discharged through the culvert and onto appellant's land was no more than would have naturally flowed upon the property in a diffused condition. Bunch v. Thomas, 121 Tex. 225, 49 S.W.2d 421. In my opinion, the facts show without dispute that surface water has been collected on the highway which otherwise would have passed in a diffused state onto appellant's land, and by the concentration of such water through the culvert it has been cast on appellant's land "in increased quantities, in a different state and in a manner well calculated to inflict injury. This being so, their acts are prohibited, not only by the civil law and the statute (Art. 7589a) under examination, but are condemned with equal emphasis by the so-called 'common law rule' or 'common enemy doctrine.'" Miller v. Letzerich, supra [121 Tex. 248, 49 S.W.2d 414].

The decisions supra unquestionably declare the law to be that a person, or a legal entity, may not impound surface water and thereby cause damage to the land of another, and that such person or legal entity may not discharge or divert surface water in an accumulated and unnatural state onto the land of another without becoming liable for the damages caused thereby. State v. Hale and State v. Malone both supra are clear in their holdings that when such acts are done by an agency of the State the act comes within the meaning of Art. 1, Sec. 17, Texas Constitution.

Here the surface water in question having drained onto the right of way it could

not be discharged or diverted therefrom in an accumulated and unnatural state onto appellant's land without violating the constitutional provision that no person's property shall be taken, damaged, destroyed or applied to public use without adequate compensation being made, unless by consent. Then clearly the damages here alleged were not lawfully done by virtue of the construction and maintenance of the highway, nor any lawful drainage or lawful operation within the meaning of the release.

The release quoted in part supra was merely a release of damages "lawfully done" to the remainder of the tract then owned by the Andersons and cannot be interpreted as a release of damages caused by "unlawful" acts such as are here alleged and testified to. The only other evidence going to the answer of the jury to issue eight is that of the witness Fincher to the effect that he sent a representative to the Andersons for the purpose of securing an easement from the culvert over their land and that he was unable to get it. This evidence also goes to the answer to issue nine.

The deed and release supra are clear and specific in their terms. The land is accurately described and the terms of the release are spelled out. There is no uncertainty or ambiguity in the language for which reason there is no ground for enlarging the grant by construction. McKee v. Stewart, 139 Tex. 260, 162 S.W. 2d 948.

The deed and release are dated February 13, 1941, six years prior to the construction in question. The deed for a recited consideration of $13 conveys a definitely described and located tract of land containing .046 acres. The release, for the same consideration, released all damages, present and future, "that may be lawfully done to the remainder of our said tract of land by virtue of the construction and maintenance of the new proposed Highway No. 29, or by virtue of any

lawful drainage in connection therewith or by virtue of any lawful operations of any nature in connection with said road and its appurtenances."

The release then clearly expresses the intention of the grantors to release the State from damages resulting from acts specified and not damages resulting from unlawful acts.

This being true then the intention of the parties is to be determined as a matter of law from the language used without the aid of evidence as to attending circumstances. Anderson & Kerr Drilling Co. v. Bruhlmeyer, 134 Tex. 574, 136 S.W. 2d 800, 805, 127 A.L.R. 1217; Texas Electric Ry. Co. v. Neale, 151 Tex. 526, 252 S.W.2d 451, 456.

The Legislature, the decisions supra and the civil and the common law have all declared the acts here complained of to be unlawful. This law as so declared enters into and is a part of the release supra. 10–A Tex.Jur. p. 389, Sec. 192.

For the above reason the jury's answer to issue eight cannot be sustained because there is no evidence to support such answer.

At the time the deed and release were executed, six years before the culvert was constructed, water had not overflowed the Anderson land. There is no evidence that at that time the Andersons were advised or had any knowledge that drainage along the highway would be changed and none that the culvert would be enlarged. Then if extrinsic evidence may be considered to determine what the parties foresaw at the time the deed was delivered and accepted, which could not, these facts are the only evidence to support the jury's answers to issue nine. The only other evidence remotely relating to that issue is that of the witness Fincher above quoted. This evidence however related to the time of the construction and not to the time of the delivery and acceptance of the deed. The question here presented

**428**

is answered in Anderson & Kerr Drilling Co. v. Bruhlmeyer, supra. There after referring to a rule to the contrary and citing authorities in support of it, the court said:

"It is plainly implied, however, from the statement of the rule that when the instrument by its terms plainly and clearly discloses the intention of the parties, or is phrased in language not fairly susceptible of more than one interpretation, the intention of the parties is to be ascertained by the court as a matter of law from the language used in the writing and without aid from evidence as to the attending circumstances. And the authorities so hold." [134 Tex. 574, 136 S.W.2d 805.] Authorities cited.

Applying this rule to the jury's answer to issue nine it must be said there is no evidence to support the answer.

The construction of the culvert by the Highway Department was a lawful act and not an invasion of the Anderson property. State v. Hale, supra; State v. Malone, supra. Indeed at that time it seems that Mr. Fincher and the Andersons anticipated that the flow of water from the culvert would not be onto the land because of the dike along their boundary line and the barrow ditches along the east and west sides of the highway and for which reason it was uncertain whether damages would result to the land. The rule applicable to this state of facts is that the landowner has the right to wait and see if water is caused to overflow his land. Baker v. City of Fort Worth, 146 Tex. 600, 210 S.W.2d 564. When damages accrued a cause of action accrued to the then owner of the land. State v. Malone, supra. Moreover appellant's cause of action against the State did not accrue until he was given permission to sue. Permission to sue was granted April 5, 1954 and suit was filed September 20, 1954.

It is my opinion that the jury's answer to issues two, eight and nine cannot be sustained; that the trial court erred in overruling appellant's motion for a new trial and for which reason the judgment of the trial court should be reversed and this cause remanded.